964 So.2d 1257 (2007)
David Alan GORE, Appellant,
v.
STATE of Florida, Appellee.
David Alan Gore, Petitioner,
v.
State of Florida, Respondent.
Nos. SC04-1458, SC05-733.
Supreme Court of Florida.
July 5, 2007.
Rehearing Denied September 10, 2007.
*1261 Andrew A. Graham of Graham, Moletteire and Torpy, Melbourne, FL, and Russell L. Akins of Smith, Akins and Associates, P.A., Fort Pierce, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, Celia A. Terenzio and Leslie Campbell, Assistant Attorneys General, West Palm Beach, FL, for Appellee/Respondent.
PER CURIAM.
David Alan Gore appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.[1] Gore also petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

*1262 FACTUAL AND PROCEDURAL HISTORY
This Court concisely detailed the facts surrounding the murder and other crimes in the direct appeal of Gore's resentencing:[2]
On July 26, 1983, Gore and his cousin Freddy Waterfield picked up teenagers Lynn Elliott and Regan Martin, who were hitchhiking. Soon after, Gore took a gun out of the glove compartment and handcuffed the two girls while Waterfield drove to Gore's parents' house. Once there, Gore bound each of the girls and placed them in separate bedrooms. Regan Martin testified that Gore cut off her clothes and forced her to perform oral sex on him while he threatened to kill her, and that Gore kept going back and forth between the two rooms. At one point when Gore was out of the room, Martin heard gunshots from outside. When Gore returned he placed her in a closet and then the attic and threatened to kill her if she tried anything. Soon after, Gore surrendered to the police and Martin was rescued. Elliott's nude body was found in the trunk of Gore's car.
Michael Rock, a teenager riding his bike by Gore's house on the day in question, testified that he saw Gore and a naked woman (Lynn Elliott) running up the driveway toward the road. Rock watched as Gore caught up with Elliott and dragged her back toward the house. He then saw Gore throw Elliott down and shoot her. Elliott had been shot twice, once in the back of the head and once in the jaw.
Gore v. State, 706 So.2d 1328, 1331 (Fla. 1997).
Gore was convicted of the first-degree murder of Lynn Elliot ("Elliot"), the kidnapping of Elliot and Regan Martin ("Martin"), and three counts of sexual battery upon Martin. See Gore v. State, 475 So.2d 1205, 1206 (Fla.1985). The jury recommended the death penalty for the murder of Elliot. See id. The trial court imposed the death sentence for the murder, and life sentences were imposed for the five other counts. See id.
On the initial direct appeal, Gore asserted the following claims involving the guilt phase:[3] (1) the trial court erred in not permitting inquiry of the jurors with regard to a mercy recommendation; (2) the trial court erred by denying Gore's motion to suppress his confession; (3) the trial court erred by admitting into evidence two prejudicial photographs (one showed Elliot in the trunk of Gore's mother's car and the other showed Elliot's hands bound behind her back); (4) the trial court should have granted Gore's request for a mistrial because of an epileptic juror's interruption of Gore's counsel during closing argument; (5) the trial court erred in disallowing a demonstration in downtown St. Petersburg; (6) the trial court erred in precluding certain testimony of Detective Pisani; (7) the trial court erred by denying a request for a mistrial that was made due to comments and conduct by the State; (8) the trial court erred by denying a request for a mistrial that was made due to the testimony of Detective Kheun; (8) the trial court erred in restricting Gore's voir dire of the jury with regard to Waterfield's involvement; and (9) the trial court erred by denying Gore's motion for judgment of acquittal or motion for new trial. See id. *1263 at 1206-09. This Court denied all of Gore's claims in affirming his conviction and death sentence. See id. at 1211.
Gore petitioned for a writ of habeas corpus in the United States District Court for the Middle District of Florida. See Gore v. Dugger, 763 F.Supp. 1110 (M.D.Fla.1989). In granting the petition, the federal court concluded that Gore's death sentence violated both Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), and Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). See Gore, 763 F.Supp. at 1119. After a new penalty phase proceeding was held, the jury unanimously recommended a death sentence. See Gore, 706 So.2d at 1331. The trial judge found the following six aggravators: (1) the capital felony was committed by a person under sentence of imprisonment (Gore was on parole for the armed trespass of a conveyance); (2) Gore's previous conviction for a violent felony (either for the armed trespass conviction, or the contemporaneous convictions for kidnapping and sexual battery); (3) the murder was committed while Gore was committing the offenses of sexual battery and kidnapping; (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest (Elliot was killed to prevent her from identifying Gore); (5) the capital felony was especially heinous, atrocious, or cruel ("HAC") (Elliot was abducted at gunpoint, tightly bound, sexually assaulted, and dragged across a driveway); and (6) the murder was committed in a cold, calculated, and premeditated manner ("CCP") (Gore's detailed plan and his threat to kill Martin accompanied by his statement that he was "going to do it anyway"). See id. The trial court found no statutory mitigating circumstances and five nonstatutory mitigating circumstances. See id. at 1331-32.[4] The trial court found that the mitigating circumstances were substantially outweighed by the aggravating circumstances, and sentenced Gore to death. See id. at 1332.
On direct appeal, this Court affirmed the death sentence that was imposed during resentencing. See id. at 1336. In that proceeding, Gore asserted the following claims: (1) the trial court erred during jury selection by denying challenges for cause to eight venire members; (2) the trial court erred by permitting the State to mislead the jury as to Gore's parole eligibility, which included responses that the trial court provided to two questions presented by the jury during deliberations; (3) the trial court erred in finding that the previous armed trespass conviction constituted a prior violent felony; (4) the trial court erred in giving jury instructions on the HAC and CCP aggravators because the instructions were unconstitutionally vague, the jury should have been instructed on the prohibition against the doubling of aggravators when they are based on the same circumstances, and the jury should have been instructed on specific nonstatutory mitigation; (5) the trial court erred in finding that the avoid arrest, CCP, and HAC aggravators had been established; (6) the State violated its agreements with the defense by utilizing particular testimony from witness Robert Stone ("Stone");[5] *1264 (7) the trial court erred by allowing a police officer to opine that Gore had lied to him; (8) it was improper for a county court judge, Judge Vaughn, to preside over this capital sentencing; and (9) Gore's resentencing violated his right to a speedy trial. See id. at 1332-36.[6] This Court denied all of Gore's claims. See id. at 1336.
On September 28, 1999, Gore filed a rule 3.850 motion for postconviction relief. On January 7, 2002, Gore filed an amended motion. On October 24, 2002, a Huff[7] hearing was held. The trial court ordered an evidentiary hearing on claims III(1)(a), III(1)(b), and III(1)(c), which addressed counsel's presentation of witnesses and the failure to object to juror Tobin for cause; on claim III(3), which addressed the failure of Gore's counsel to elicit testimony with regard to the fee charged by the State's mental health expert, Dr. Cheshire; and on claim III(4), which addressed the failure of Gore's counsel to present witnesses to demonstrate that Gore suffered from neurological disorders. An evidentiary hearing was held and on June 9, 2004, the trial court issued an order that denied postconviction relief on all of his claims. This appeal followed.

MOTION FOR POSTCONVICTION RELIEF

I. Presentation of Untruthful Parole Possibilities
Gore asserts that the State knowingly presented the false testimony of Stone that Gore could receive parole at "any time," because of the new evidence discovered at the evidentiary hearing that Stone only met with the State prior to the resentencing to discuss his testimony and the State has imputed knowledge of the correct parole possibilities. A Giglio[8] violation exists when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. See Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. See id. at 1050. Gore also asserts that he was prevented from arguing the correct sentencing alternative of life imprisonment without eligibility for parole for fifty years as a mitigating circumstance, because the trial court incorrectly instructed the jury that the alternative to the death penalty was life imprisonment without eligibility for parole for twenty-five years.
This general claim involving the alleged untruth with regard to Gore's parole possibilities was previously litigated on direct appeal. In Gore, 706 So.2d 1328, this Court's conclusions included the following: (1) a jury instruction that stated the life sentence for Elliot's murder included eligibility for parole after twenty-five years was correct; (2) the trial court's response to the second jury question asking when Gore could receive parole on the other life sentences was correct;[9] and (3) any alleged *1265 error with regard to Stone's testimony that none of Gore's life sentences had a minimum mandatory sentence was not preserved for appellate review because defense counsel failed to object. See id. at 1332-33. Gore cannot bring a second appeal on the parole possibilities that were presented to the jury. See Maharaj v. State, 684 So.2d 726, 728 (Fla.1996) ("It is inappropriate to use a collateral attack to relitigate an issue previously raised on appeal."). Despite couching his challenge in terms of a Giglio violation, Gore is making the same general argument that he made on direct appeal: that the parole possibilities presented to the jury were incorrect and, therefore, a resentencing is warranted. Gore is procedurally barred from making the same challenge in a postconviction proceeding. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995) (concluding that it is "not appropriate to use a different argument to relitigate the same issue").
As previously described, this Court on direct appeal has already specifically addressed (and concluded that it was without merit) Gore's current claim that the jury instruction which stated that Gore would be eligible for parole after twenty-five years for Elliot's murder was error. The one claim that was not specifically litigated on direct appeal addressed Stone's response to the question about Gore's kidnapping and sexual battery offenses, when Stone testified that Gore could receive parole at "any time." On direct appeal, this Court held that Gore could not argue error with Stone's testimony about minimum mandatory sentences[10] because it was procedurally barred due to the failure of Gore's counsel to object to it. See Gore, 706 So.2d at 1333. To preserve error for appellate review, the general rule is a contemporaneous, specific objection must occur during trial at the time of the alleged error. See F.B. v. State, 852 So.2d 226, 229 (Fla.2003); Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982). In the instant postconviction matter, the Giglio claim involving Stone's "any time" testimony is without merit.[11]
Even without the earlier procedural bar, we conclude that the requirements of Giglio are not met. Under the first prong of Giglio, the testimony of Stone with regard to when parole could occur was technically not false. Even Gore acknowledges that when Stone stated that he could receive parole at "any time," *1266 Stone was being questioned with regard to the noncapital felonies of kidnapping and sexual battery. For first-time offenders, convictions for kidnapping and sexual battery offenses committed prior to October 1, 1983, do not require minimum mandatory sentences in Florida. See § 775.082(3)(a)(1), Fla. Stat. (2005). Gore could technically receive parole at "any time" for each of these particular offenses in isolation. There was no inquiry specifically about the practical or combined effect of all of Gore's sentences on his parole possibilities. Therefore, without a clear and more fully developed context, the first prong for a Giglio violation is unsatisfied as the State did not necessarily present false testimony through witness Stone.[12]

II. Improper Ex Parte Communications
Gore asserts that a letter sent by the State to the resentencing court on December 4, 1992,[13] and a motion filed by the State on February 17, 1992,[14] were improper ex parte communications. Gore also asserts that it was error for the trial court judge at resentencing to deny the motion to disqualify himself, because this judge was a material witness to the ex parte communications. In Rose v. State, 601 So.2d 1181 (Fla.1992), this Court discussed the negative effect of ex parte communications:
Nothing is more dangerous and destructive of the impartiality of the judiciary than a one-sided communication between a judge and a single litigant. . . .
. . . Except under limited circumstances, no party should be allowed the advantage of presenting matters to or having matters decided by the judge without notice to all other interested parties. . . .
. . . The guaranty of a fair and impartial trial can mean nothing less than this.
. . . [W]e understand that this would not include strictly administrative matters not dealing in any way with the merits of the case.
Id. at 1183 (quoting In re Clayton, 504 So.2d 394, 395 (Fla.1987) and State ex rel. Davis v. Parks, 141 Fla. 516, 194 So. 613, 615 (1939)). Unlike Rose and other cases in which this Court has ordered a resentencing, such as Reese v. State, 728 So.2d 727, 728 (Fla.1999), or ordered an evidentiary hearing on the improper ex parte *1267 communication issue, both parties in the instant matter were given an opportunity to make their arguments to the judge at the resentencing prior to the issuance of the sentencing order. After the jury returned its death recommendation, Gore responded negatively to the court's question as to whether there was anything additional that needed to be addressed. Subsequently, a notice of hearing, which was to occur on December 8, 1992, was sent to all parties on November 23, 1992. Gore was provided with the opportunity to make an argument as to the proposed mitigators and aggravators after December 4, 1992, which was the date the State's letter was filed with the trial court. Therefore, this letter from the State is not the type of ex parte communication with which this Court had concerns in Rose, which is a communication that risks the judge "being unduly swayed by unrebutted remarks" and destroys the "appearance of the impartiality of the tribunal." 601 So.2d at 1183.
Also, even though portions of the trial court's findings do closely resemble the language in material submitted by the State, the two are not identical. Instead, the trial court made additional findings that were not proposed by the State. For example, the trial court found that the CCP aggravator was supported by the fact that Gore concealed Elliot's body in the trunk of a vehicle and attempted to divert the police by making phony 911 calls. These arguments were not made by the State, demonstrating that the State did not effectively write the resentencing order through the material submitted. See Jones v. State, 845 So.2d 55, 64 (Fla.2003) (holding that the defendant failed to offer competent evidence that the resentencing court failed to engage in an independent weighing of aggravators and mitigators, because the version of the order drafted by the prosecutor was not identical to the final order entered by the trial judge). Therefore, during the Huff hearing, the trial court did not err in finding that the resentencing court independently weighed the aggravators and mitigators, rather than solely relying on the State's letter.
Additionally, Gore's claim that the letter constituted an improper ex parte communication is based on speculation. See Jones, 845 So.2d at 64 (rejecting defendant's request for postconviction relief for an alleged improper ex parte contact, because the defendant's assertions were based on speculation and "[p]ostconviction relief cannot be based on speculative assertions"). Speculation just as easily supports the scenario that Gore's counsel was provided a copy of the State's letter, consistent with the letter's "cc" notation that indicated such, and that Gore's counsel may have misplaced the copy. At the Huff hearing, Gore withdrew his assertion that the trial court had requested that the State provide this letter, because there were "no facts to back up that allegation." Accordingly, there is no support for Gore's argument that another resentencing is necessary due to an ex parte communication.
The claim involving the motion filed by the State also fails on the merits. The State's motion requested action that was strictly administrative and had nothing to do with the merits of the case. See Arbelaez v. State, 775 So.2d 909, 916 (Fla.2000) (holding that an ex parte communication that involved the judge setting a time period for when a response to a 3.850 motion could be filed was strictly administrative under Rose). The results of motion subject to this claim were as follows: (1) a hearing date was set; (2) defense counsel was appointed; and (3) a determination was made that Gore should be transported. *1268 These are not merit-related issues.[15] Accordingly, this ex parte communication involving the State's motion is also not improper.
If an argument that the ex parte communications were improper is "conclusively refuted" by the record, the trial court's denial of an evidentiary hearing should be affirmed. See Waterhouse v. State, 792 So.2d 1176, 1189 (Fla.2001) (affirming the trial court's denial of an evidentiary hearing on the ineffective assistance claim involving the failure of defendant's counsel to impeach a State witness, because the claim was conclusively refuted by the record). Based upon our prior analysis determining that a resentencing is not warranted, we conclude that an evidentiary hearing on these alleged ex parte communications is also not needed because the record conclusively refutes Gore's argument that they were improper.
Gore also claims it was error for the trial judge to deny the motion to disqualify, because this judge was a material witness to the allegedly improper ex parte communication. A motion to disqualify is governed substantively by section 38.10, Florida Statutes (2005), and procedurally by Florida Rule of Judicial Administration 2.330. The rule provides that a motion to disqualify shall show that "the party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge"; or that the judge is either an interested party to the matter, related to an interested party, related to counsel, or "is a material witness for or against one of the parties to the cause." Fla. R. Jud. Admin. 2.330(d). The standard of review of a trial judge's determination on a motion to disqualify is de novo. See Chamberlain v. State, 881 So.2d 1087, 1097 (Fla.2004), cert. denied, 544 U.S. 930, 125 S.Ct. 1669, 161 L.Ed.2d 495 (2005). Whether the motion is legally sufficient is a question of law. See Barnhill v. State, 834 So.2d 836, 843 (Fla.2002). The standard for determining the legal sufficiency of a motion to disqualify is whether the facts alleged, which must be assumed to be true, would cause the movant to have a well-founded fear that he or she will not receive a fair trial at the hands of that judge. See Fla. R. Jud. Admin. 2.330(d)(1). In the instant matter, there was no error in the trial court's denial of the motion to disqualify due to legal insufficiency, because the alleged ex parte communications with the trial judge, as noted above, were not improper. Compare Hodges v. State, 885 So.2d 338, 354 (Fla. 2004) (holding that the trial court did not err in rejecting defendant's motion to disqualify because the only basis supporting a well-grounded fear that he would not receive a fair trial was that the ex parte communications were improper, and this claim was rejected), with Roberts v. State, 840 So.2d 962, 968 (Fla.2002) (holding that the motion to disqualify was legally sufficient, because the judge had asked the State to draft the sentencing order and had failed to independently weigh the aggravators and mitigators).

III. Ineffective Assistance of Counsel During the Resentencing
Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that successful ineffective assistance of *1269 counsel claims satisfy the following two requirements:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). There is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id. In Occhicone v. State, 768 So.2d 1037 (Fla.2000), this Court held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Id. at 1048.

A. Decisions Involving Witness Stone
Gore argues that counsel was ineffective in deciding to call witness Stone during resentencing. This claim fails on the merits. Gore never produced lead counsel Nickerson at the evidentiary hearing, which would have provided insight into his decisions with regard to witness Stone, so the available testimony is relegated to that of co-counsel Udell. Despite Udell's description of Nickerson's decision to call Stone as "surprising," we conclude that the decision could have been considered "sound trial strategy" from the perspective of Nickerson at the time. Strickland, 466 U.S. at 690, 104 S.Ct. 2052. The decision to call Stone was made solely by Nickerson. At the evidentiary hearing, Udell testified, "I think it's quite clear that we all kn[e]w that Mr. Stone was not going to be friendly to David Alan Gore in his testimony. . . ." Despite this predicted unfriendliness, Stone was seemingly called for a strategic reason that both Udell and this Court recognized on direct appeal: to elicit testimony that Waterfield was not sentenced to death and, because the State had argued that both Gore and Waterfield were equally culpable, proportionality necessitated that Gore also not receive the death penalty. See Gore, 706 So.2d at 1335. Other possible strategic reasons for calling Stone include the presentation of testimony that Gore had received life sentences for the kidnapping and sexual battery crimes perpetrated on Elliot and Martin (illustrating that Gore would likely never be released from prison), and to elicit testimony demonstrating the inconsistent statements that the State made with regard to the culpability of Gore and Waterfield. With three viable strategies, Nickerson's decision to call Stone does not qualify as deficient performance. Gore has not met his burden in overcoming the presumption of "sound trial strategy." Strickland, 466 U.S. at 690, 104 S.Ct. 2052. *1270 Indeed, it appears that Gore's counsel should have located and presented evidence from Nickerson, as his testimony would have directly revealed his strategies in calling Stone.[16]
Gore also argues that counsel was ineffective for the failure to interview or depose Stone between the time he was subpoenaed and the time he testified. At the evidentiary hearing, Stone testified that after he was subpoenaed by Gore's counsel, he had no contact with either Nickerson or Udell, but he did discuss what his testimony on cross-examination might be as to parole possibilities with the State. Udell speculated that Nickerson's reason for not speaking with or deposing Stone was that perhaps Nickerson already knew the testimony Stone would deliver. Again, Gore's claim is hindered by Nickerson not testifying at the evidentiary hearing. Speculation by co-counsel Udell as to why Nickerson did not speak to Stone prior to the hearing is insufficient to meet Gore's weighty burden on this ineffective assistance claim. Gore presented no evidence at the hearing that this failure to contact Stone prior to the hearing fell below "prevailing professional standards." Maxwell, 490 So.2d at 932. Moreover, even if Nickerson's performance was deficient, there was no prejudice. It still would have been reasonable to call Stone due to the aforementioned strategic reasons.
Gore also argues that counsel was ineffective for the failure to object to Stone's testimony that Gore could receive parole at "any time," which led to a waiver of this issue for direct appeal. We conclude that Gore's counsel at resentencing was not deficient for failing to object. As previously described, this questioning occurred in the narrow context of the kidnapping and sexual battery charges, rendering the "any time" response to be arguably technically correct. Thus, the decision to not object can be considered within "sound trial strategy" at the time. Strickland, 466 U.S. at 690, 104 S.Ct. 2052; see Wright v. State, 581 So.2d 882, 883 (Fla.1991) (holding that the ineffective assistance claim with regard to the failure to object had no merit, because this error was "strategic in nature and this Court will not second guess trial strategy employed by trial counsel"). Again, because lead counsel Nickerson did not testify at the evidentiary hearing, Gore has not met his weighty burden. To satisfy the deficient performance requirement, evidence was needed but lacking that alternative courses were not considered in deciding upon this trial strategy of not objecting to Stone's "any time" testimony. See Occhicone, 768 So.2d at 1048. Additionally, there was also no prejudice. As described above, if the "any time" testimony was error it was nothing more than harmless error due to the record and overwhelming evidence supporting the trial court's finding of the six aggravators at resentencing. Accordingly, the failure to object does not undermine our confidence in the outcome.
Gore also argues that counsel was ineffective for the failure to present additional witnesses to illustrate that Gore could not receive parole for fifty years. We disagree. At the evidentiary hearing, Udell testified that he remembered testimony from Stone that Gore received life sentences for the kidnapping and sexual batteries involving Elliot and Martin, so it *1271 was unlikely that Gore would ever be released from prison. The likely combined or practical effect of Gore's various sentences was already illustrated to the jury, so Gore's counsel did not need to present another witness. See Whitfield v. State, 923 So.2d 375, 380 (Fla.2005) (holding that the failure to call certain witnesses was not ineffective assistance, because witnesses had already presented similar evidence and "counsel is not required to present cumulative evidence"). Additionally, the significance of the testimony that the combined or practical effect of Gore's sentences was that he would not receive parole for fifty years would have been immediately negated through damaging cross-examination that could potentially reveal that Gore could technically receive parole after twenty-five years for Elliot's murder in isolation. See Jones v. State, 928 So.2d 1178, 1185 (Fla.2006) (citing Johnson v. State, 921 So.2d 490, 501 (Fla.2005)) ("Counsel cannot be deemed ineffective for failing to present evidence that would open the door to damaging cross-examination and rebuttal evidence that would counter any value that might be gained from the evidence."). Even if deficient performance was found, the prejudice requirement has not been met. On direct appeal, this Court held that the jury instruction indicating that Gore would be eligible for parole after twenty-five years was not error. See Gore, 706 So.2d at 1332. With the jury being instructed on the possibility of parole after twenty-five years, it is highly unlikely that a witness who testified that Gore, for all practical purposes, could not receive parole for fifty years would have changed the outcome at the resentencing. Additionally, the trial court at resentencing found six aggravating circumstances and no statutory mitigating circumstances. See id. at 1331-32. Accordingly, we conclude that the failure of Gore's counsel to offer a witness on this subject did not so "affect[] the fairness and reliability of the proceeding that confidence in the outcome is undermined." Maxwell, 490 So.2d at 932.

B. Failure to Impeach Dr. Cheshire with Financial Bias
Gore argues that counsel was ineffective at the resentencing for the failure to question Dr. Cheshire about his fee and how often he testified for the State. Gore's counsel was not deficient in this regard. As with other aspects of the resentencing, lead counsel Nickerson was responsible for the strategy utilized with Dr. Cheshire on cross-examination. At the evidentiary hearing, Udell testified that he did not know why Cheshire was not questioned by Nickerson on financial bias. Again, Gore has not met his burden on this ineffective assistance claim because Udell cannot provide evidence about what Nickerson may have been thinking in his decisions, and Nickerson was not produced as a postconviction witness. Udell did testify, however, that he believed questions as to financial bias are overrated as "jurors know these people are getting paid." Therefore, Nickerson's decision to not impeach through questions targeted at financial bias can certainly be viewed as "sound trial strategy." Strickland, 466 U.S. at 690, 104 S.Ct. 2052. The record on resentencing demonstrates that Nickerson extensively cross-examined Cheshire on his substantive conclusions, which, unlike financial bias questions, directly attacked his conclusions. Gore's expert at resentencing stipulated that there is no absolute rule or checklist for financial bias questions that must be asked of expert witnesses under all circumstances.[17]
*1272 Also, even if the deficiency prong was satisfied, there was no prejudice. Dr. Cheshire testified that Gore was not an alcoholic, did not have a dependent personality disorder, and did not have an extreme mental or emotional disturbance; but was instead suffering from adult antisocial behavior without mental illness. He also testified that it was impossible for Gore to ingest the amount of alcohol he claimed and show no signs of impairment. The testimony of Cheshire contradicted some of the mitigators that Gore claimed, but other evidence presented was sufficient to refute those mitigators even without the testimony of Cheshire. For example, Gore's argument that he was intoxicated by alcohol at the time of the incident was refuted by numerous other individuals, rather than just Cheshire. At the resentencing, Martin testified that Gore did not smell of alcohol, did not slur his words, did not have bloodshot eyes, and was in complete control. Eyewitness Michael Rock testified that Gore did not stagger in the driveway when he ran after Elliot. Detective Redstone, Captain Dubois, and Officer Raymond all testified that Gore had no signs of alcohol impairment at the time of arrest. Therefore, Cheshire's testimony was not essential to the trial court finding the existence of no statutory mitigators on resentencing.
Even if one or more mitigators could have been found by the trial court had Cheshire been impeached with financial bias, a death sentence would have likely still resulted due to the strength of the six aggravators that were independently found. First, Gore was under a sentence of imprisonment at the time of Elliot's murder, because he was on parole for the armed trespass conviction. Second, the armed trespass conviction was a prior violent felony due to the discovery of a handgun and police scanner in the victim's car with Gore, and the discovery of handcuffs and rope in Gore's car nearby at the time of this offense. Third, the Elliot murder was clearly committed while Gore was engaged in the crimes of kidnapping and sexual battery, because Gore was convicted of kidnapping Elliot and the testimony at resentencing established that Gore had committed sexual batteries on Elliot. Fourth, the avoid arrest aggravator was supported by the murder occurring when Elliot tried to escape and only after she struggled during Gore's attempts to return her to the house. Fifth, the HAC aggravator is supported by the following: (1) Gore "hogtied" Elliot so tightly prior to her murder that a welt formed; (2) Gore sexually battered Elliot prior to her murder; and (3) Gore dragged Elliot, who was nude, along the ground back toward the house immediately prior to shooting her. Sixth, the following "overwhelming" evidence helped establish the CCP aggravator: (1) Gore said to the girls at the house, "Don't try anything or I'll come back and kill you"; (2) Gore told Martin, while she was performing oral sex on him, to "suck harder" or else he was "going to slice [her] throat"; (3) Gore said to Martin, in reference to slicing her throat, that he was "going to do it anyway"; (4) Gore used a police scanner to monitor threats of detection by the police; (5) Gore concealed Elliot's body in a car trunk; and (6) Gore placed phony 911 calls in an attempt to divert police from his residence. See Gore, 706 So.2d at 1334 (discussing that the evidence *1273 in support of the CCP aggravator in the instant matter was "overwhelming"); Fotopoulos v. State, 608 So.2d 784, 792-93 (Fla.1992) (holding that the murder was committed in a cold, calculated, and premeditated manner due to the heightened premeditation illustrated by how the defendant carefully planned and prearranged the murder). Accordingly, the failure to impeach Cheshire with financial bias does not undermine our confidence in the outcome.

C. Co-Counsel Udell's Deference to Lead Counsel Nickerson
Gore argues that co-counsel Udell was ineffective due to his total deference to lead counsel Nickerson. We conclude that this decision by Udell to defer to Nickerson could have been considered "sound trial strategy" at the time, because of Udell's reasonable beliefs that Nickerson had superior qualifications to take the lead in the case. Strickland, 466 U.S. at 690, 104 S.Ct. 2052. At the evidentiary hearing, Udell testified that he deferred to Nickerson because Nickerson was intelligent and had better experience with capital cases and Gore had a lot of personal confidence in him. We conclude that Udell made a strategic decision to defer to Nickerson, and such was arguably "reasonable under the norms of professional conduct." Occhicone, 768 So.2d at 1048. When Udell finally discovered at the evidentiary hearing that Nickerson had only practiced law for approximately three years at the time of the 1992 resentencing, Udell stated that he was "surprised" by this information. Any mistaken belief that Udell had as to Nickerson's experience was reasonable, because according to Udell, Nickerson appeared to know everybody and was completely "immersed" in the area of capital litigation. Additionally, Udell was never aware that there was a bar grievance pending against Nickerson during preparation for and the actual resentencing. Finally, contrary to Gore's argument, we conclude that Udell did not totally defer to Nickerson but, rather, assumed an active role by providing input on trial strategy. For example, Udell discussed possible nonstatutory mitigators with Nickerson. Therefore, Udell's strategic decision to defer on a limited basis to the apparent abilities of Nickerson did not constitute deficient performance.

D. Failure to Discover and Present Additional Mitigators Relating to Alleged Neurological Disorders
Gore argues that his counsel was ineffective due to the failure to investigate his past involvement with toxic citrus groves that allegedly caused neurological disorders, which could have then been offered as mitigating evidence. Gore has not established that the performance of his counsel was deficient. The general rule is "[a]n attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." Ventura v. State, 794 So.2d 553, 570 (Fla.2001) (quoting Rose v. State, 675 So.2d 567, 571 (Fla.1996)). Although Nickerson apparently did not ask Gore's mother any specific questions about agricultural chemicals or the citrus groves, Nickerson did ask her about Gore's health as is demonstrated by her resentencing testimony that ant bites had given Gore convulsions when he was seventeen months old. Additionally, Gore's counsel asked her whether Gore was an alcoholic. Udell's testimony that Nickerson "got very close to David and David's mom and dad" indicates that there was a good and open relationship with essential persons to assist with the investigation as Nickerson was analyzing Gore's past. Finally, Udell testified that he was present during conversations that Nickerson had with Gore's family with regard to *1274 Gore's life and a search and investigation into Gore's past did occur. Cf. Ragsdale v. State, 798 So.2d 713, 719 (Fla.2001) (holding that counsel was ineffective due to an inadequate investigation and failure to present particular mitigators when "counsel's entire investigation consisted of a few calls made by his wife to Ragsdale's family members"); Heiney v. State, 620 So.2d 171, 172 (Fla.1993) (holding that there was ineffective assistance when counsel "totally fail[ed] to investigate potential mitigating factors").
The decision by Gore's counsel not to pursue a theory that pesticide exposure from the citrus groves may have led to neurological disorders without proper supporting evidence, and then present this as a mitigator, was within the range of "sound trial strategy" at the time this decision was made. Strickland, 466 U.S. at 690, 104 S.Ct. 2052. At the evidentiary hearing, Udell stated that it is dangerous to make tenuous arguments that sound only like "lawyer talk," because the jury might punish that party for making a seemingly senseless argument. Nickerson could have engaged in that thought process when he determined that he would not pursue this argument, but again, this was not confirmed because Nickerson did not testify at the evidentiary hearing. Additionally, those directly and personally involved with Gore's life were also apparently of the same view that this was a weak theory as Udell testified that he did not believe the issue of pesticides from the citrus groves was ever raised by Gore or his family. Gore's failure to inform counsel about the alleged exposure to the pesticides precludes Gore from arguing that counsel was ineffective for failing to offer this potential mitigating evidence. See Stewart v. State, 801 So.2d 59, 67 (Fla. 2001) (holding that the failure to communicate instances of childhood abuse to defense counsel or the defense psychiatrist precludes an ineffective assistance claim for failing to pursue such mitigation). Also, the testimony of two entomologists at the evidentiary hearing demonstrated that the theory that Gore suffered neurological disorders from pesticide exposure was extremely tenuous, at best. Dr. Nigg testified that it is uncertain how the agricultural chemicals, to which Gore was supposedly exposed by working and living near the citrus groves, affect humans on a long-term basis. In analyzing a test done on Gore's blood, he said some of his chemical composition levels, such as with mercury and cadmium, were troublesome because they were too low. Also, Gore's lead level of 20 ug/dL was considered a "normal lead blood level." This testimony contradicts Gore's assertion that he was overexposed to high levels of agricultural chemicals. Similarly, Dr. Napp testified that he had no knowledge of anyone developing health problems from lead arsenic, and he opined that there are no long-term effects associated with exposure to organo-phosphates and there has never been a case of overexposure to Calthane or Ethion in Florida. These are all agricultural chemicals to which Gore was allegedly exposed. Finally, there was no direct evidence, such as a medical diagnosis, that Gore actually suffered from any neurological disorders, which he now argues resulted from exposure to agricultural chemicals. Instead, only evidence that Gore suffered from totally different health problems, such as high fevers and convulsions, was presented.
Instead, Gore's counsel focused on other theories and presented extensive mitigating evidence related to those theories at the resentencing. Gore's counsel called approximately ten witnesses, including Michael Maher and Peter Maculuso, who were both mental health experts. In preparing for his testimony, Dr. Maher reviewed *1275 a medical history of Gore, which was provided by Gore's counsel, and questioned Gore about his background. The mitigation that was presented included the following: (1) Gore was the son of hard-working parents; (2) Gore was shy and introverted in comparison to Waterfield; (3) Gore's divorce and separation from his children had negatively affected him; (4) Gore used alcohol around the time of the murder; and (5) Gore was an alcoholic. Moreover, Udell testified that all mitigation that "seemed consistent with [Gore's] best interests" was presented at the resentencing. This evidence establishes that Gore's counsel was not deficient.
Even if Gore's counsel was deficient, we conclude that there was no prejudice. As previously described, extensive mitigation was already presented at the resentencing. Even if the trial court at resentencing had found this one additional mitigating factor involving neurological disorders from citrus grove pesticide exposure, which is a tenuous theory at best, this would not have overcome the trial court's finding of six aggravating factors which, as previously described, are supported by strong evidence. Therefore, we conclude that counsel's failure to present the mitigating evidence with regard to the citrus grove pesticide exposure is not of such a nature that "confidence in the outcome is undermined" due to the failure to present this evidence. Strickland, 466 U.S. at 690, 104 S.Ct. 2052.

E. Failure to Challenge Juror Tobin for Cause
Gore argues that his counsel was ineffective for the failure to present a challenge for cause with regard to juror Tobin at the resentencing, after Tobin stated during voir dire that an impoverished background may not be a proper mitigating circumstance. Nickerson's failure to challenge this juror for cause was not deficient performance. We have reviewed the record and conclude that Tobin did not give unequivocal answers that would render him subject to removal for cause. See Spencer v. State, 842 So.2d 52, 68 (Fla. 2003) ("It is sufficient if the juror can lay aside his or her opinion or impression and render a verdict based on the evidence presented in court." (citing Castro v. State, 644 So.2d 987, 990 (Fla.1994))). Instead, Tobin also stated "that he would be fair and impartial and would follow the law as instructed by the court." There was also arguably no prejudice as the trial court likely would not have excused Tobin for cause had this challenge been made. See Dufour v. State, 905 So.2d 42, 54 (Fla. 2005) (holding that the ineffective assistance claim for failing to strike a juror was without merit, because the juror was "properly permitted to serve because she clearly indicated an ability to follow the trial court's instructions and weigh the aggravating and mitigating factors" through later responses, despite the initial statement of bias by the juror).

F. Failure to Propose an Expanded CCP Jury Instruction
Gore argues that his counsel was ineffective for the failure to propose an expanded CCP jury instruction. Gore's counsel was not deficient in this regard. The resentencing of Gore occurred prior to Jackson v. State, 648 So.2d 85 (Fla. 1994), in which this Court held that the standard CCP jury instruction was unconstitutionally vague. See id. at 87. Gore's counsel was not deficient for the failure to offer an alternative CCP instruction, because Gore's counsel was not even required to initially object to the standard CCP jury instruction as this jury instruction was considered proper at that time. See Downs v. State, 740 So.2d 506, 518 *1276 (Fla.1999) (holding that because the CCP instruction given at the resentencing was approved by this Court as the proper standard jury instruction, defense counsel was not ineffective for failing to object). Additionally, there was no prejudice. On direct appeal, this Court previously determined that regardless of the type of CCP instruction given to the jury, the jury would have returned a finding of CCP due to the overwhelming evidence of this aggravator. See Gore, 706 So.2d at 1334. Accordingly, any error with regard to the CCP jury instruction was harmless. See id.

IV. Death Row is Cruel and Unusual Punishment
Gore argues that his twenty-three years served on death row is cruel and unusual punishment, and violates both the Eighth and Fourteenth Amendments of the United States Constitution. This Court has consistently rejected the argument that serving time on death row is cruel and unusual punishment, regardless of the time served. See Lucas v. State, 841 So.2d 380, 389 (Fla.2003) (holding that over twenty-five years on death row is not cruel and unusual punishment); Foster v. State, 810 So.2d 910, 916 (Fla.2002) (holding that twenty-three years on death row is not cruel and unusual punishment). Gore's exercise of his constitutional rights through the appeal and postconviction process has prevented his death sentence from being executed, so he may not claim a constitutional violation due to his length of time on death row. See Knight v. State, 746 So.2d 423, 437 (Fla.1998) ("[N]o federal or state courts have accepted [the] argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay."). Therefore, Gore's claim is without merit.

V. Furman[18] Violation with Death Penalty Statute
Gore argues that the death penalty is unconstitutional under the Eighth Amendment of the United States Constitution. This claim is procedurally barred, because Gore failed to make this argument in his direct appeal of the resentencing. See Gore, 706 So.2d 1328; Maharaj, 684 So.2d at 728. Additionally, there is nothing in the record that indicates Gore properly preserved this argument for appellate review during the resentencing. See Fotopoulos, 608 So.2d at 794 & n. 7 (holding that the argument that "Florida law unconstitutionally creates a presumption of death" was not properly preserved at the trial level). Even without this procedural bar, this Court has repeatedly summarily denied this claim due to its lack of merit, regardless of the circumstances. See Atwater v. State, 788 So.2d 223, 228 (Fla.2001); Hunter v. State, 660 So.2d 244, 252-53 (Fla.1995); Fotopoulos, 608 So.2d at 794.

PETITION FOR WRIT OF HABEAS CORPUS

I. Apprendi and Ring Violation with Death Penalty Statute
Gore asserts that his sentence of death must be vacated because according to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Florida's capital sentencing scheme violates his Sixth Amendment right to a jury trial and his Fourteenth Amendment right to due process under the United States Constitution. The claim is without merit. This Court addressed the contention that Florida's capital sentencing scheme violates the United States Constitution under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. *1277 2348, 147 L.Ed.2d 435 (2000), and Ring, in Bottoson v. Moore, 833 So.2d 693 (Fla. 2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and denied relief. See also Jones, 845 So.2d at 74. We conclude that Gore is likewise not entitled to relief on this claim. Furthermore, one of the aggravating circumstances found by the trial court in this matter was Gore's prior conviction of a violent felony, "a factor which under Apprendi and Ring need not be found by the jury." Jones v. State, 855 So.2d 611, 619 (Fla.2003); see also Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (rejecting the Ring claim where one of the aggravating circumstances found by the trial judge was the defendant's prior conviction for a violent felony), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Finally, this Court has previously held that Ring and Apprendi cannot receive retroactive application. See Johnson v. State, 904 So.2d 400, 412 (Fla.2005) (holding that Ring does not apply retroactively in Florida in postconviction proceedings to cases that were final on direct review at the time of the Ring decision); Hughes v. State, 901 So.2d 837, 840 (Fla. 2005) (holding that Apprendi does not apply retroactively in Florida in postconviction proceedings to cases that were final on direct review at the time of the Apprendi decision). Here, the claim is procedurally barred as Gore's direct appeal to this Court occurred prior to the decisions in both Ring and Apprendi. Accordingly, we reject this claim.

II. Ineffective Assistance of Counsel During the Appellate Process
Gore asserts that counsel was ineffective for the failure to challenge the constitutionality of Florida's death penalty statute under Ring and Apprendi. As a general rule, claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla.1981). "If a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Rutherford v. Moore, 774 So.2d 637, 643 (Fla. 2000) (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)). As described above, we conclude that there is no merit to Gore's claim that Florida's death penalty statute is unconstitutional under Ring and Apprendi. Therefore, we conclude that appellate counsel was not ineffective for failing to bring this meritless claim.

CONCLUSION
For the foregoing reasons, we affirm the trial court's denial of Gore's rule 3.850 *1278 motion and deny Gore's petition for writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Gore's postconviction motion was filed under Florida Rule of Criminal Procedure 3.850 on September 28, 1999, and his amended 3.850 postconviction motion was filed on January 7, 2002. The current version of the rule, Florida Rule of Criminal Procedure 3.851, "appl[ies] to all postconviction motions filed on or after October 1, 2001." Fla. R.Crim. P. 3.851(a).
[2] The resentencing occurred after a federal court overturned Gore's death sentence. See Gore v. Dugger, 763 F.Supp. 1110 (M.D.Fla. 1989), aff'd, 933 F.2d 904 (11th Cir.1991).
[3] Gore also asserted claims involving the penalty phase, but we have omitted these claims due to the later resentencing (and the subsequent direct appeal) that occurred.
[4] The trial court found the following nonstatutory mitigating circumstances: (1) Gore's past conduct and probable future conduct in prison; (2) Gore's impoverished childhood; (3) Gore's exemplary conduct at the resentencing; (4) Gore's mental depression at the time he committed the murder; and (5) Gore's affection for his children and his separation from them. See Gore, 706 So.2d at 1332-33.
[5] In separate trials, Stone personally prosecuted both Waterfield (who was Gore's accomplice) and Gore for their roles in the crimes surrounding the instant matter.
[6] Seven other issues that were raised by Gore were rejected by this Court without discussion due to their lack of merit.
[7] Huff v. State, 622 So.2d 982 (Fla.1993).
[8] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[9] The trial court's response was that the jury should rely on their "own recollection of the evidence" that had been presented, which included the testimony of Stone that none of Gore's life sentences contained a minimum mandatory sentence. See Gore, 706 So.2d at 1333. The effect of no minimum mandatory sentences, according to Stone, was Gore could receive parole at "any time" on the sexual battery and kidnapping offenses.
[10] This Court summarized the argument by Gore that was procedurally barred as "[o]n cross-examination, Stone testified that Gore's five life sentences boiled down to the equivalent of two consecutive life sentences, and that none of his sentences contain any minimum mandatory sentence." Gore, 706 So.2d at 1333 n. 8.
[11] Gore incorrectly asserts that the claim could not be brought on direct appeal, because evidence of this violation was not discovered until the 2003 evidentiary hearing. This new evidence was that the State met with Stone after he was subpoenaed, and discovered the substance of his testimony to be presented at the resentencing, including testimony that Gore could receive parole at "any time." Gore's argument that this claim could not be brought on direct appeal is inconsistent with his argument that the State has imputed knowledge of the true parole possibilities. This imputed knowledge theory is based on both the Parole Commission and the prosecutor in the instant matter working for the government of the State of Florida. Gore alleged that the State presented untruthful parole possibilities through the testimony of Stone, and failed to correct this false information despite the State's imputed knowledge at that time of the true parole possibilities. Even without the "new" evidence, which was discovered in 2003, Gore could have challenged Stone's testimony in the direct appeal of the resentencing in 1997, because Stone had already testified and the State had imputed knowledge at the time of his testimony.
[12] Even if this testimony could be deemed false, the lack of a broader context surrounding Stone's "any time" statement would prevent a conclusion, under the second prong of Giglio, that the State knowingly presented false testimony. Only if Gore's counsel had established that Stone was testifying to the combined or practical effect of Gore's various sentences could the State's presentation of Stone's testimony that Gore could receive parole at "any time" possibly meet the second prong under Giglio. Additionally, we conclude that the materiality prong of Giglio is not met because of the overwhelming evidence supporting the trial court's finding of the six aggravators at resentencing. See Ponticelli v. State, 941 So.2d 1073, 1088 (Fla. 2006) (discussing that the third prong of Giglio "requires the State to prove that the presentation of false testimony was `harmless beyond a reasonable doubt' or . . . that `there is no reasonable possibility that the error contributed to the conviction.'").
[13] The State provided a "letter" to the trial court that was actually a cover letter and a memorandum of law, which extensively detailed findings on aggravating and mitigating circumstances. The State initially argued that the trial court requested this letter, but later withdrew this argument. The letter had a "cc" notation indicating that a copy was sent to Gore's counsel.
[14] The State's motion was entitled "Ex Parte Motion to Appoint Counsel, Transport the Defendant and Set Case for Pre-Sentencing and Sentencing Hearing," and it presented arguments on these various issues.
[15] Contrary to Gore's argument, the significance of these issues does not factor into the Rose test. It is entirely possible for an ex parte communication to involve a matter that is extremely significant but also strictly administrative, so it is not improper under Rose.
[16] After the evidentiary hearing, the trial court found that Gore gave no explanation as to why Nickerson could not testify at the hearing or what efforts were made to secure his attendance.
[17] We note that testimony from Gore's alleged expert that Nickerson's cross-examination of Cheshire did not meet the local community's standard of care for lawyers is weakened by the following, which demonstrate his lack of expertise on criminal capital matters: (1) he is a civil trial lawyer who only handles personal injury and legal malpractice cases; (2) he admitted that he is unqualified to handle a capital case; and (3) this was the first time that he had testified as an expert on the subject.
[18] Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).