PER CURIAM.
 

 David Eugene Johnston, a prisoner under sentence of death, appeals the postcon-viction court’s order denying his fourth and fifth successive motions for postconviction relief, filed under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm the postconviction court’s orders denying Johnston’s successive motions for postcon-viction relief.
 

 FACTS AND PROCEDURAL HISTORY
 

 On May 18, 1984, Johnston was convicted of the first-degree murder of Mary Hammond, which occurred on November 5, 1983, in Orange County, Florida. After a jury trial, the trial court sentenced Johnston to death. His conviction and sentence were affirmed by this Court on direct appeal.
 
 Johnston v. State,
 
 497 So.2d 863 (Fla.1986). The facts and circumstances of the murder are summarized as follows:
 

 At approximately 3:30 a.m. on November 5, 1983, David Eugene Johnston called the Orlando Police Department, identified himself as Martin White, and told the police “somebody killed my grandma” at 406 E. Ridgewood Avenue. Upon their arrival, the officers found the dead body of 84-year-old Mary Hammond. The victim’s body revealed numerous stab wounds as well as evidence of manual strangulation. The police arrested Johnston after noticing that his clothes were blood-stained, his face was scratched and his conversations with the various officers at the scene of the crime revealed several discrepancies as to his account of the evening’s events.
 

 The record reveals that prior to the murder Johnston had been working at a demolition site near the victim’s home and had had contact with the victim during that time. In fact, Johnston was seen washing dishes in the victim’s apartment five nights before the murder.
 

 Johnston was seen earlier on the evening of the murder without any scratches on his face and the clothing he was wearing tested positive for blood. In addition, the watch that Johnston was seen wearing as late as 1:45 a.m. on the morning of the murder was found covered with blood on the bathroom coun-tertop in the victim’s home. Further, a butterfly pendant that Johnston was seen wearing as late as 2:00 a.m. that morning was found entangled in the victim’s hair. The record also reveals that a reddish-brown stained butcher-type knife was found between the mattress and the boxspring of the victim’s bed, a footprint matching Johnston’s was found outside the kitchen window of the victim’s house, and that silver tableware, flatware, a silver candlestick, a wine bot-tie and a brass teapot belonging to the victim were found in a pillowcase located in the front-end loader parked at the demolition site.
 

 Id.
 
 at 865. Johnston gave the police a number of different statements about his
 
 *15
 
 interactions with victim. In his statements to police, Johnston said he went by the victim’s home in the early morning hours of November 5, 1983, and saw lights on in the apartment. He said he went into the unlocked apartment to check on Mary Hammond, but the evidence also showed that a window to the apartment was broken and a key case belonging to the victim was found outside the apartment. Johnston also told police conflicting stories about seeing a man running from the apartment. Although Johnston first told police he found the victim dead, he later said he found her alive but injured on her bed, where he spoke to her and cradled her head. He said that after he got blood on himself, he washed it off in the victim’s bathroom. The jury convicted Johnston of first-degree murder and, after a penalty phase proceeding, recommended a death sentence by an eight-to-four vote.
 

 Governor Martinez signed the first warrant for Johnston’s execution on October 28, 1988, but the execution was stayed after Johnston filed his initial motion for postconviction relief and petition for habe-as corpus. This Court affirmed denial of Johnston’s postconviction claims relating to his competency to stand trial, claims of ineffective assistance of trial counsel, and several constitutional challenges to his sentence of death, and we denied habeas relief.
 
 Johnston v. Dugger,
 
 583 So.2d 657 (Fla.1991). Subsequently, Johnston filed a petition for writ of habeas corpus in the federal district court raising claims of ineffective assistance of counsel, competency, and constitutional claims relating to the penalty phase. That petition was denied and the denial was affirmed by the Eleventh Circuit Court of Appeals.
 
 Johnston v. Singletary,
 
 162 F.3d 630, 632 (11th Cir.1998).
 

 This Court subsequently affirmed denial of Johnston’s second motion for postcon-viction relief and denied his second petition for habeas corpus, in which he raised claims relating to competency, ineffective assistance of counsel in the penalty phase, trial court errors in the penalty phase, and issues relating to the sentencing factors.
 
 Johnston v. State,
 
 708 So.2d 590 (Fla.1998). After this Court issued its decision in
 
 Stephens v. State,
 
 748 So.2d 1028, 1033-34 (Fla.1999), which clarified the standard to be used in reviewing ineffective assistance of counsel claims, Johnston filed another petition for writ of habeas corpus in this Court, arguing that
 
 Stephens
 
 should apply retroactively to his case. Relief was denied in
 
 Johnston v. Moore,
 
 789 So.2d 262, 263 (Fla.2001).
 

 In June 2002, Johnston filed a third motion to vacate judgment of conviction and sentence, asserting that he is mentally retarded and that his execution would violate his constitutional rights under the holding of the United States Supreme Court in
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that it is unconstitutional to execute a person who is mentally retarded; and in August 2002, Johnston added a challenge to the constitutionality of his death sentence in response to the United States Supreme Court’s decision in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that a defendant has a Sixth Amendment right to have a jury find all facts upon which the Legislature conditions an increase in the maximum punishment.
 
 See id.
 
 at 589, 122 S.Ct. 2428. We affirmed denial of the
 
 Atkins
 
 and
 
 Ring
 
 claims in
 
 Johnston v. State,
 
 960 So.2d 757, 758 (Fla.2006).
 

 On April 20, 2009, Governor Charlie Crist signed a second death warrant authorizing Johnston’s execution. Johnston was appointed new counsel, who then filed a fourth successive motion for postconviction relief in the trial court raising five
 
 *16
 
 claims and two motions.
 
 [1]
 
 In addition to his successive postconviction claims, he filed a motion for DNA testing under Florida Rule of Criminal Procedure 3.853 seeking testing of certain items of clothing and the fingernail clippings taken from the victim.
 
 [2]
 
 Johnston also moved for production of other evidentiary items on which he sought to have additional forensic testing performed. On May 8, 2009, the postcon-viction court denied the motion for DNA testing and the motion for production of evidence for forensic testing. The court also denied relief on the remainder of the claims. Johnston then filed this appeal. After oral argument was held, we granted a stay of execution on May 21, 2009, and relinquished jurisdiction to the trial court for ninety days for DNA testing of the victim’s fingernail clippings and certain items of Johnston’s clothing said to bear indications of blood.
 

 The postconviction court directed the Florida Department of Law Enforcement (FDLE) to conduct DNA testing on the items of clothing and the victim’s fingernail clippings. After that testing, the FDLE report was submitted stating in part that no blood could be found on the items of clothing and accordingly, no DNA testing was performed on the clothing. Based on the FDLE lab report, Johnston filed a fifth successive motion for postcon-viction relief, alleging that the FDLE lab report was newly discovered evidence that proved there was no blood on his clothes, which if introduced at trial would probably have resulted in an acquittal. The victim’s fingernail clippings were tested for DNA by FDLE but the lab could not obtain a complete DNA profile. FDLE could only say that the material under the victim’s fingernails came from a male. FDLE also reported that it did not have the capability of performing the Y-STR DNA testing necessary to develop a complete profile of that male DNA and recommended that the Y-STR DNA testing be conducted elsewhere.
 

 
 *17
 
 The Y-STR DNA testing was subsequently completed by LabCorp, a private molecular biology and pathology laboratory in North Carolina, with observers from the Florida Department of Law Enforcement and from DNA Diagnostics of Fair-field, Ohio, a laboratory that Johnston had specifically requested. On August 17, 2009, the postconviction court held a hearing at which the court received the DNA report. Dr. Julie Heinig of DNA Diagnostics of Fairfield, Ohio, testified that she had observed the testing done by LabCorp and had conferred with Megan Clement of LabCorp concerning the testing. Dr. Heinig testified that appropriate procedures were followed and that, according to the DNA testing report, the Y-STR DNA testing indicated that David Johnston’s DNA profile was consistent with the profile obtained from Mary Hammond’s fingernails, and therefore neither he nor his paternally related relatives could be excluded as a contributor to that DNA sample. The report stated as follows:
 

 Based on the results listed above, the Y chromosome DNA profile obtained from the DNA extract from K7a [fingernail clippings] (Item 1) and the partial Y chromosome DNA profile obtained from the DNA extract from K7b [fingernail clippings] (Item 2) are consistent with the Y chromosome DNA profile obtained from the reference sample from David E. Johnston (Item 4); therefore, David E. Johnston and his paternal relatives cannot be excluded as the source of the male DNA in these samples.
 

 Johnston’s fifth successive motion for post-conviction relief did not cite the LabCorp DNA test results as a ground for relief, but alleged only that the FDLE report stating that no blood was found on the items of clothing was newly discovered evidence that mandated a new trial.
 

 The court and parties agreed to take evidence at that same August 17, 2009, hearing on the FDLE report that was the basis of Johnston’s fifth successive motion for postconviction relief. The trial court then heard the testimony of FDLE laboratory analyst Corey Crumbley, who testified that she conducted testing on the clothing items and submitted a report dated June 10, 2009. The testing results and the report show that the items of clothing tested did not have any indications of the presence of blood on them.
 
 [3]
 
 Crumbley testified that DNA testing was not available at the time of the crime, but that the clothing items were tested for blood in 1984 using the same test that is used now, the phenolphthalein Kastle-Meyer color screen test. Crumbley cross-referenced the current report to the FDLE report dated January 20, 1984, which indicated the presence of blood on a number of the items, and explained:
 

 I looked back into the case file to see where they identified blood previously, and those areas appear to have been consumed at the time of that prior testing. Once I saw that, I examined the item as if it had never been examined before to see if I could find any other areas that there might be blood.
 

 The original cuttings from the items of evidence were not available to her. The 1984 FDLE report indicated that all the samples taken from the shorts were consumed by the testing, as was the sample taken from the right shoe. The left shoe had no cuttings taken and showed no evidence of blood and, at the 1984 trial, the FDLE report did not indicate the presence of blood on the left tennis shoe. Crumbley also testified that the socks she was given
 
 *18
 
 to test had no cuttings taken from them and that current testing showed no evidence of blood on the socks. Similarly, we note that in 1984, FDLE witness Keith Paul testified that no blood was found on the socks.
 

 Crumbley further testified that she was familiar with the findings in the original trial report and that the new testing results did not cast any of those 1984 sero-logical findings into doubt. She explained:
 

 [W]hen I looked at the evidence and the areas where it appeared that positive results for blood had been obtained, there were cuttings removed, no stain visible, so there was no reason for me to think that I was either going to get a positive result or negative result now as related to back then. If I got a negative result, it wouldn’t necessarily have called those results into question because there was no stain for me to test.
 

 The trial court entered its final order on August 18, 2009, denying postconviction relief. The final order resolved the original motion for DNA testing filed by Johnston, which prompted the relinquishment, and resolved the fifth successive motion for postconviction relief that Johnston filed August 14, 2009, based on information revealed in the FDLE lab report. After discussing the standard of review for a claim of newly discovered evidence in the order, citing
 
 Jones v. State,
 
 709 So.2d 512, 521 (Fla.1998)
 
 (Jones II),
 
 the postconviction court stated that “the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial” and that “[t]o reach this conclusion the trial court is required to consider all newly discovered evidence which would be admissible at trial and then evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.” The postconviction court denied relief on the newly discovered evidence claim, concluding in essence that if the FDLE report were admitted into evidence at a retrial, when considered in the light of all other admissible evidence, it would not probably result in an acquittal. At the conclusion of the relinquishment, we granted supplemental briefing on Johnston’s fifth successive postconviction motion.
 

 We turn now to Johnston’s claims on appeal, beginning with his fifth successive motion for postconviction relief filed during the relinquishment proceeding. In that motion, Johnston claims that the FDLE lab report stating that the chemical presence of blood was not found on the clothing tested by FDLE is newly discovered evidence that would probably result in an acquittal. As explained below, we find that there is no merit to this claim.
 

 ANALYSIS
 

 Johnston’s Fifth Successive Motion for Postconviction Relief
 

 Standard of Review
 

 In order for Johnston to obtain a new trial based on newly discovered evidence, he must meet two requirements. First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, “the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.”
 
 Jones II,
 
 709 So.2d at 521. Newly discovered evidence satisfies the second prong of the
 
 Jones II
 
 test if it “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.”
 
 Jones II,
 
 709 So.2d at 526 (quoting
 
 Jones v. State,
 
 678 So.2d 309, 315 (Fla.1996)). “If the defendant is seeking to vacate a sentence, the second prong
 
 *19
 
 requires that the newly discovered evidence would probably yield a less severe sentence.”
 
 Marek v. State,
 
 14 So.3d 985, 990 (Fla.2009) (citing
 
 Jones v. State,
 
 591 So.2d 911, 915 (Fla.1991)
 
 (Jones
 
 I)).
 

 In determining whether the evidence requires a new trial, the circuit court must “consider all newly discovered evidence which would be admissible” and must “evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.”
 
 Heath v. State,
 
 3 So.3d 1017, 1024 (Fla.2009) (quoting
 
 Jones I,
 
 591 So.2d at 916). Once it is determined that the newly discovered evidence would be admissible, “an evaluation of the weight to be accorded the evidence includes whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence.”
 
 Jones II,
 
 709 So.2d at 521. “The trial court should also determine whether the evidence is cumulative to other evidence in the case” and consider “the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.”
 
 Id.; see also Lowe v. State,
 
 2 So.3d 21, 33 (Fla.2008). With this standard of review in mind, we turn to Johnston’s claim in his fifth successive postconviction motion.
 

 Discussion
 

 Johnston contends that the June 10, 2009, FDLE lab report constitutes newly discovered evidence that blood was not found on Johnston’s clothes and warrants a new trial. He contends that had the jury known of the new evidence it probably would have acquitted him of the murder of Mary Hammond. Within this issue, Johnston also contends that the trial court summarily denied his claim as outside the scope of relinquishment or that, alternatively, the court ruled on the merits but applied the wrong standard. The State responds that the trial court did consider the newly discovered evidence claim on the merits and that the order clearly recites the
 
 Jones II
 
 newly discovered evidence standard. The State points out that the trial court order states, “In an effort to resolve all pending matters before this court, the court finds that Mr. Johnston’s successive motion can be considered herein as a collateral matter arising out of the DNA testing results.” The State also argues and we agree that in deciding if a new trial is warranted, the trial court must consider all admissible evidence, which in this case includes the new DNA evidence matching Johnston’s profile. We conclude that the trial court applied the correct newly discovered evidence standard and determined, in light of all the now available and admissible evidence, that the newly discovered evidence would not exonerate him.
 

 We conclude that the trial court correctly stated the
 
 Jones II
 
 newly discovered evidence standard and applied that standard in evaluating the evidence presented at the August 17, 2009, hearing. The testimony taken at the hearing from FDLE analyst Corey Crumbley was comprehensive concerning the results of certain testing done by the FDLE in June 2009. Crumbley explained that there was no basis to conclude that the serological evidence presented at trial by FDLE analyst Keith Paul based on the January 1984 lab report was faulty in any respect. She explained that the testing for presence of blood on the shorts and shoe would have consumed the entirety of the test cuttings. Thus, the fact that no blood can now be found on an item does not prove that there was never any blood on the item. She found no blood on the socks, but Paul testified at trial that no blood was found on the socks. Based on that evidence, the trial court correctly concluded that there is no reasonable probability that the newly
 
 *20
 
 discovered FDLE report would produce an acquittal or lesser sentence.
 

 Moreover, the newly discovered evidence must be considered in the context of all admissible evidence, which now includes the DNA testing results done by LabCorp matching Johnston’s profile to the DNA found in the victim’s fingernail clippings. Dr. Heinig testified that the Y-STR DNA test results did not exclude Johnston as a contributor to that DNA. The evidence presented at trial in 1984 included the fact that Johnston had a scratch on his face and that Johnston’s shirt tested positive for blood. The shirt was not retested in the current round of testing, nor did Johnston request any testing of that item. Thus, the evidence presented at trial that the shirt bore chemical indications of human blood remains unassailed. Other evidence presented at trial implicated Johnston in the murder. We conclude that the postconviction court had before it in the record competent, substantial evidence— both in the August 17, 2009, evidentiary hearing and in the record of the 1984 jury trial — on which to conclude that admission of the 2009 FDLE lab report and testimony would not probably result in an acquittal. Even if the trial court had summarily denied the newly discovered evidence claim in Johnston’s fifth successive 3.851 motion, as Johnston suggests, the record, including the new DNA testing results and the testimony presented on August 17, 2009, conclusively refutes the claim that the newly discovered evidence would probably result in an acquitted or lesser sentence on retrial.
 

 Further, Johnston’s alternative claim that the trial court denied the motion as outside the scope of the relinquishment has no merit. Although the trial court did state that “this court concludes that it has the authority to deny Mr. Johnston’s Successive Motion to Vacate Judgment and Sentence on the basis of
 
 Duckett
 

 [4]
 

 alone,” it is clear in the order that the trial court did not deny the motion as outside the scope of the relinquishment order. To the contrary, the postconviction court stated that Johnston’s successive motion could be considered as a collateral matter arising out of the DNA testing results.
 

 Because the trial court did reach the merits of the newly discovered evidence claim and did apply the correct test, considering all the admissible evidence in the case to determine the merits of the claim, the postconviction court’s order denying relief on the newly discovered evidence claim is affirmed.
 

 Newly Discovered Evidence Claim Relating to Other Forensic Evidence
 

 Johnston’s next claim asserts that a recent report by the National Academy of Sciences titled
 
 Strengthening Forensic Science in the United States: A Path Forward
 
 (2009), constitutes newly discovered evidence that proves he was convicted on infirm forensic evidence and that the trial court erred in summarily denying that claim.
 
 [5]
 
 The postconviction court summarily denied the claim, concluding that the report was not newly discovered evidence and that it did not establish that any particular test, test result, or testimony at Johnston’s trial was faulty. As we explain below, we agree with the postconviction
 
 *21
 
 court that the report presented by Johnston does not constitute newly discovered evidence.
 

 A trial court’s “summary denial of a newly discovered evidence claim will be upheld if the motion is legally insufficient or its allegations are conclusively refuted by the record.”
 
 Taylor v. State,
 
 3 So.3d 986, 999 (Fla.2009). Further, as we have explained, in order to merit relief on the grounds of newly discovered evidence, two requirements must be satisfied: First, “the evidence ‘must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence.’ ”
 
 Jones II,
 
 709 So.2d at 521 (quoting
 
 Torres-Arboleda v. Dugger,
 
 636 So.2d 1321, 1324-25 (Fla.1994)). Second, if evidence is determined to be newly discovered, the evidence must be such that on retrial, the defendant would probably be acquitted.
 
 See id.
 

 The report cited by Johnston does not meet the test for newly discovered evidence. Pursuant to a 2005 federal law, a forensic science committee was created by the National Academy of Sciences to examine the status of and address the most important issues facing the forensic science community.
 
 [6]
 
 The committee considered testimony and other data from a diverse group of entities and individuals who play a role in the field of forensic science. The committee developed a number of recommendations directed at enhancing education, furthering research, and developing more consistency across the forensic science disciplines. These findings and recommendations are discussed in the report. Johnston argues that information contained in the report casts enough doubt on the forensic testing done in his case that, if it were introduced at trial, would result in his acquittal.
 

 First, we note that the report cites to existing publications, some of which were published even before Mary Hammond’s murder. The majority of the remaining publications were published during the years when Johnston was pursuing post-conviction relief. Therefore, we decline to conclude that the report is newly discovered evidence. Moreover, even if the report were newly discovered evidence, we conclude that the report lacks the specificity that would justify a conclusion that it provides a basis to find the forensic evidence admitted at trial to be infirm or faulty. The following statement in the report’s executive summary is particularly telling: “The committee decided early in its work that it would not be feasible to develop a detailed evaluation of each discipline in terms of its scientific underpinning, level of development, and ability to provide evidence to address the major types of questions raised in criminal prosecutions and civil litigation.” As a result, we agree with the following observation of the postconviction court:
 

 The report does not establish that any particular test, test result, or specific testimony presented at Mr. Johnston’s trial was faulty or otherwise subject to challenge. Furthermore, it is merely a new or updated discussion of issues regarding developments in forensic testing. It does not constitute evidence that was not known at trial and could not have been ascertained through due diligence.
 

 Nothing in the report renders the forensic techniques used in this case unreliable, and we note that Johnston has not identified
 
 *22
 
 how the article would demonstrate, in any specific way, that the testing methods or opinions in his case were deficient.
 

 Specifically, we reject Johnston’s claim that use of the report would show the blood spatter evidence and testimony in his case was unreliable because the investigator who testified about it was trained by Judith Bunker. We have previously rejected claims targeting Judith Bunker’s qualifications and her role in training experts who have testified in other trials. Further, in 1998, we found there was no merit to Johnston’s postconviction claim that information about Bunker’s qualifications constituted newly discovered evidence in this case.
 
 See Johnston,
 
 708 So.2d at 593 n. 6 (citing
 
 Correll v. State,
 
 698 So.2d 522 (Fla.1997)). Given that we rejected a postconviction challenge to Bunker in the
 
 Correll
 
 case, in which she actually testified, we decline to conclude that Johnston has provided newly discovered evidence in this case demonstrating infirmity in the testimony of a witness because he was trained by her.
 
 See Correll,
 
 698 So.2d at 524 (concluding that Bunker’s exaggerated credentials had little effect on the outcome of the case, especially given the undisputed fact that she “worked on thousands of cases while in the employ of the medical examiner”);
 
 see also Hannon v. State,
 
 941 So.2d 1109, 1122-23 (Fla.2006) (same);
 
 Gorby v. State, 819
 
 So.2d 664, 677 (Fla.2002) (same). We conclude that Johnston’s assertions in this claim merit no relief.
 

 Next, we find no merit in Johnston’s claim that the report renders the luminol testing on his clothing, which was the subject of testimony at his trial, unreliable. We note that neither the luminol testimony given at his trial nor the article upon which he bases this claim constitutes newly discovered evidence. Further, although Officer Donald Ostermeyer testified at trial that results of luminol testing on Johnston’s clothing were presumptively positive for blood, the officer admitted that the test was inconclusive and could render false positive results. This testimony was available to the jury in their determination of how much weight, if any, to give the lumi-nol results. In any event, serologist Keith Paul also testified at trial that he tested Johnston’s clothing for blood in the laboratory and confirmed that the shirt and shorts, as well as one shoe, bore evidence of human blood. Thus, this claim is without merit.
 

 We also reject Johnston’s challenge to the fingerprint analysis based on the National Academy of Science forensic report. Johnston contends that the fingerprint analysis completed in his case was faulty because four latent prints found at the crime scene were not compared with an individual named Jose Gutierrez who was in the vicinity on the evening of the murder and who, according to Johnston, was suspicious. Johnston does not explain how the report constitutes newly discovered evidence that assists him in that regard because both the unidentified fingerprints and the presence of Gutierrez in the neighborhood were known at the time of trial. Moreover, Gutierrez testified at trial and explained his presence in the neighborhood. He explained that he was a friend of the victim’s granddaughter and her husband, and was waiting for them that night to go out to a social event. This fact was confirmed by the victim’s granddaughter, who testified that she and her husband were supposed to meet Gutierrez that evening. Consequently, this claim has no merit.
 

 Finally, Johnston also asserts that the forensic science report constitutes newly discovered evidence demonstrating that the footwear analysis in his case was faulty, thus requiring a new trial. We dis
 
 *23
 
 agree. The section of the report cited by Johnston that addresses footwear analysis cites to works published in 1970 and 1980, well before Johnston’s trial. The report also cites to a number of works published during the intervening period — while Johnston pursued postconviction relief. The fact that existing data has now been consolidated into a report does not render the report newly discovered evidence. Thus, the postconviction court properly concluded that the committee’s report is not newly discovered evidence. Moreover, we note that the expert shoeprint testimony was impeached during cross-examination at trial. When forensic expert Terrell Kingery testified at trial that a shoeprint found outside the victim’s window could have been made by one of Johnston’s shoes, his method for testing the shoe-print, and the alleged deficiencies in that method, were fully explored in cross-examination. The jury was apprised of the fact that Kingery put the shoes on his own feet and tested them in soil that was different from the victim’s yard. Thus, there is no merit to this aspect of Johnston’s claim.
 

 For all the foregoing reasons, we affirm the postconviction court’s denial of Johnston’s newly discovered evidence claim based on the National Academy of Sciences report titled
 
 Strengthening Forensic Science in the United States: A Path For-ivard.
 

 Production of Evidence for Additional Forensic Testing
 

 Johnston’s next claim challenges the postconviction court’s denial of his Motion to Produce Evidence for Forensic Testing, in which he sought access to fingerprint and shoeprint evidence, in addition to the items of clothing that were tested during the relinquishment. Johnston sought production of the evidence in order to perform additional forensic testing, arguing that the forensic testing done at the time of trial was faulty, based on the National Academy of Science report discussed above. We conclude the postcon-viction court did not err in denying production of the fingerprints and shoeprint evidence for additional testing, and that denial of the motion did not deprive Johnston of due process.
 

 Although the fingerprint evidence presented at trial did not incriminate Johnston, he now contends, as discussed above, that the fingerprints should be produced so that they can be compared to those of Jose Gutierrez. However, the fingerprints are not newly discovered evidence, and Johnston knew of Gutierrez at trial but only now seeks to compare his fingerprints to those found at the scene. For these reasons, any claim based on these fingerprints is procedurally barred. Even if the claim were not procedurally barred, Johnston has not provided any basis to conclude the results of the fingerprint testing would probably result in his acquittal. As explained above, Jose Gutierrez’s presence near the victim’s home that night was fully explored at trial during his testimony. We also agree with the postconviction court that testing of these fingerprints now would not be likely to demonstrate that the forensic testing done for trial was deficient.
 

 Johnston also sought production of his shoes and the plaster shoeprint castings that were admitted into evidence at trial. As discussed above, forensic expert Terrell Kingery testified at trial concerning the shoeprint. His method for testing the shoeprint and the deficiencies in that method were fully explored in cross-examination. Johnston has not established, and we do not find, that further testing of the shoeprint evidence would probably result in an acquittal on retrial.
 

 The postconviction court denied the motion for production of the finger
 
 *24
 
 print evidence and the shoes and castings, concluding first that there is no reasonable probability that the results of additional forensic testing would exonerate Johnston of the crime. The court also concluded that there is no absolute right to production of evidence, which is in the nature of a discovery request, in this postconviction proceeding. We agree that the request is in the nature of postconviction discovery. There is no unqualified general right to engage in discovery in a postconviction proceeding. “[AJvailability of discovery in a postconviction case is a matter firmly within the trial court’s discretion.”
 
 Marshall v. State,
 
 976 So.2d 1071, 1079 (Fla.2007). We have held that “[a] trial court’s determination with regard to a discovery request is reviewed under an abuse of discretion standard.”
 
 Overton v. State,
 
 976 So.2d 536, 548 (Fla.2007). In denying the motion, the postconviction eourt properly considered the issues, the fact that Johnston had almost twenty-five years in which to make this motion, and the fact that he only speculates that additional testing could disclose forensic deficiencies. Thus, we conclude that the court did not abuse its discretion in denying the motion.
 

 Because Johnston has not shown that the trial court abused its discretion in denying production for additional testing or that any of the testing would probably result in his acquittal, relief is denied on this claim.
 

 Florida’s Clemency Procedure
 

 Johnston next contends that the clemency proceeding he was provided in 1987 was inadequate because it was held before the postconviction proceedings were concluded and before his mental health issues and life history were fully developed for consideration in the clemency process. He also contends that the clemency process in Florida is unconstitutional because it is arbitrary, lacks standards, is one-sided, and fails to take into account information developed in postconviction proceedings. Johnston argues that clemency in Florida does not provide the “fail safe” that clemency is envisioned to be by the United States Supreme Court. The Supreme Court in
 
 Herrera v. Collins,
 
 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), did recognize that “[executive clemency has provided the ‘fail safe’ in our criminal justice system.”
 
 Id.
 
 at 415, 113 S.Ct. 853 (quoting Kathleen Dean Moore,
 
 Pardons: Justice, Mercy, and the Public Interest
 
 131 (1989)). In
 
 Harbison v. Bell,
 
 — U.S. —, — - —, 129 S.Ct. 1481, 1490-91, 173 L.Ed.2d 347 (2009), the Supreme Court again recognized clemency proceedings as the “fail safe” in the criminal justice system. We conclude that the clemency system in Florida performed as intended in providing a “fail safe” for Johnston. He was given a full clemency hearing in 1987 at which he was represented by counsel. When the death warrant was signed on April 20, 2009, it stated that “it has been determined that Executive Clemency, as authorized by Article IV, Section 8(a), Florida Constitution, is not appropriate.” Thus, clemency was again considered by the executive branch prior to the signing of the warrant in this case.
 

 Moreover, we have considered and rejected this same claim in other cases where a full clemency proceeding had been held and because the clemency process is a matter for the executive branch.
 
 See, e.g., Rutherford v. State,
 
 940 So.2d 1112, 1122-23 (Fla.2006) (rejecting attack on clemency process where a clemency hearing was held and because it is an executive function);
 
 King v. State,
 
 808 So.2d 1237, 1246 (Fla.2002) (holding that clemency claim was meritless in light of precedent);
 
 Glock v. Moore,
 
 776 So.2d 243, 252 (Fla.2001) (rejecting clemency claim where Glock had a clemency hearing and because the mat
 
 *25
 
 ter is an executive function);
 
 Bundy v. State,
 
 497 So.2d 1209, 1211 (Fla.1986) (clemency is an executive function and it is not the Court’s prerogative to second-guess that executive decision).
 

 More recently, a challenge to Florida’s clemency procedure was rejected in
 
 Marek v. State,
 
 8 So.3d 1123 (Fla.),
 
 cert. denied,
 
 — U.S. —, 130 S.Ct. 40, 174 L.Ed.2d 625 (2009). There, we again addressed challenges to Florida’s clemency procedure raised by Marek, who was under an active death warrant at that time, stating:
 

 Marek asserts that the clemency process is one-sided, arbitrary, and standardless. Again, his argument is without merit. In
 
 Rutherford v. State,
 
 940 So.2d 1112 (Fla.2006), the defendant — relying on the ABA report — argued that Florida’s clemency process is arbitrary and capricious. This Court rejected the argument “that the ABA Report requires us to reconsider our prior decisions rejecting constitutional challenges to Florida’s clemency process.”
 
 Id.
 
 at 1122.
 

 Moreover, Marek and the State agree that a full clemency proceeding was conducted in 1988 and that public records demonstrate that in 2008, the Governor corresponded with the Florida Parole Commission about Marek. Marek’s death warrant expressly states that “it has been determined that Executive Clemency, as authorized by Article IV, Section 8(a), Florida Constitution, is not appropriate.” Previously, in
 
 Bundy v. State,
 
 497 So.2d 1209, 1211 (Fla.1986), this Court, in rejecting Bundy’s contention that he was entitled to time to prepare and present an application for clemency before execution, explained that
 

 [i]t is not our prerogative to second-guess the application of this exclusive executive function. First, the principle of separation of powers requires the judiciary to adopt an extremely cautious approach in analyzing questions involving this admitted matter of executive grace. As noted in
 
 In re Advisory Opinion of the Governor,
 
 334 So.2d 561, 562-63 (Fla.1976), “[t]his Court has always viewed the pardon powers expressed in the Constitution as being peculiarly within the domain of the executive branch of government.”
 

 Bundy,
 
 497 So.2d at 1211 (some citations omitted);
 
 accord Glock v. Moore,
 
 776 So.2d 243, 253 (Fla.2001);
 
 Provenzano v. State,
 
 739 So.2d 1150, 1155 (Fla.1999). Marek has not presented any reason that this Court should depart from these precedents.
 

 Marek,
 
 8 So.3d at 1129-30.
 

 Johnston contends that his original clemency hearing was inadequate to protect his rights because it was conducted before his full life history and mental illness history were developed. We rejected a similar argument in
 
 Bundy
 
 that time must be given to prepare and present a case for clemency in a second clemency proceeding before the death sentence may be carried out.
 
 Bundy,
 
 497 So.2d at 1211. We also noted in
 
 Marek v. State,
 
 14 So.3d 985 (Fla.2009), after Marek raised a second challenge to the clemency process, that “five justices of the United States Supreme Court concluded [in
 
 Ohio Adult Parole Authority v. Woodard,
 
 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) ] that some minimal procedural due process requirements should apply to clemency ... [b]ut none of the opinions in that case required any specific procedures or criteria to guide the executive’s signing of warrants for death-sentenced inmates.”
 
 Marek,
 
 14 So.3d at 998. We again conclude that no specific procedures are mandated in the clemency process and that
 
 *26
 
 Johnston has been provided with the clemency proceedings to which he is entitled.
 

 Further, we decline to depart from the Court’s precedent, based on the doctrine of separation of powers, in which we have held that it is not our prerogative to second-guess the executive on matters of clemency in capital cases. Johnston has not provided any reason for the Court to depart from its precedents or to hold that an additional clemency proceeding is required before a death warrant is signed. Because these same claims have been raised and ruled on in the Court’s prior precedents, and Johnston has provided no reason for the Court to depart from those precedents, relief is denied.
 

 Claim of Mental Illness as a Bar to Execution
 

 Johnston argues, as he did in the postconviction court, that he is exempt from execution under the Eighth Amendment to the United States Constitution because his severe mental illness places him in the same category as those whose executions are barred because they were under the age of eighteen at the time of the murder or are mentally retarded. The court below denied relief, finding Johnston’s claim was procedurally barred for not having been raised on direct appeal or in prior posteonviction proceedings and because, under this Court’s precedents, mental illness is not a per se bar to execution. We agree with both these conclusions.
 

 Relying on the reasoning behind the United States Supreme Court’s rulings in
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding the death penalty unconstitutional for defendants under age eighteen at the time of the crime) and
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding the death penalty unconstitutional for mentally retarded defendants), Johnston argues that it similarly constitutes cruel and unusual punishment to execute a defendant who is severely mentally ill.
 
 [7]
 
 He contends that his mental illness and neurological impairments, which have been documented in various proceedings in the record, cause him to experience the same deficits in reasoning, understanding and processing information, learning from experience, exercising good judgment, and controlling impulses as those experienced by mentally retarded individuals and by those who commit murder while under the age of eighteen. However, we agree with the postconviction court that the claim is procedurally barred because it could have been, but was not, raised on direct appeal or in any of the numerous prior postcon-viction motions.
 
 [8]
 

 Even if the claim were not procedurally barred, we would conclude that it is without merit. The same claim Johnston makes has been repeatedly rejected by the Court. In
 
 Nixon v. State,
 
 2 So.3d 137 (Fla.2009), the Court held:
 

 Lastly, Nixon asserts that the trial court erroneously denied him a hearing
 
 *27
 
 on his claim that mental illness bars his execution. We rejected this argument in
 
 Lawrence v. State,
 
 969 So.2d 294 (Fla.2007), and
 
 Connor v. State,
 
 979 So.2d 852 (Fla.2007). In
 
 Lawrence,
 
 we rejected the defendant’s argument that the Equal Protection Clause requires this Court to extend
 
 Atkins
 
 to the mentally ill.
 
 See
 
 969 So.2d at 300 n. 9. In
 
 Con-nor,
 
 we noted that “[t]o the extent that Connor is arguing that he cannot be executed because of mental conditions that are not insanity or mental retardation, the issue has been resolved adversely to his position.”
 
 Connor,
 
 979 So.2d at 867 (citing
 
 Diaz v. State,
 
 945 So.2d 1136, 1151 (Fla.)
 
 cert. denied,
 
 549 U.S. 1103, 127 S.Ct. 850, 166 L.Ed.2d 679 (2006) (indicating that neither the United States Supreme Court nor this Court has recognized mental illness as a per se bar to execution)). Accordingly, Nixon is not entitled to relief on this claim.
 

 Id.
 
 at 146. In
 
 Lawrence v. State,
 
 969 So.2d 294 (Fla.2007), we also rejected the claim Johnston makes here — that defendants with mental illness must be treated similarly to those with mental retardation because both conditions result in reduced culpability.
 
 Id.
 
 at 300 n. 9. We find no reason to depart from these precedents. For all these reasons, relief is denied on Johnston’s claim that his mental illness is a bar to execution.
 

 Length of Time on Death Row
 

 Johnston next claims that his prolonged time on death row — almost twenty-five years — renders the execution of his death sentence unconstitutional, in violation of the prohibition of cruel and unusual punishment under the Eighth Amendment to the United States Constitution. We disagree. We have previously rejected similar arguments and recently addressed this same issue in
 
 Marek v. State,
 
 where we explained:
 

 With regard to the claim about the length of time Marek has spent on death row, we have previously rejected similar arguments. In
 
 Tompkins [v. State],
 
 994 So.2d [1072, 1085 (Fla.2008)], we held that twenty-three years on death row did not constitute cruel and unusual punishment. We explained that “this Court recognized that ‘no federal or state court has accepted the argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay.’ ”
 
 Id.
 
 (quoting
 
 Booker v. State,
 
 969 So.2d 186, 200 (Fla.2007)). In this case, Marek has contributed to the delay of his execution by filing several postconviction motions and habeas petitions. He has also been a party to several class action proceedings. As we stated in
 
 Tompkins,
 
 “He cannot now contend that his punishment has been illegally prolonged because the delay in carrying out his sentence is in large part due to his own actions in challenging his conviction and sentence.”
 
 Id.
 

 Marek,
 
 8 So.3d at 1131;
 
 see also Gore v. State,
 
 964 So.2d 1257, 1276 (Fla.2007) (holding that twenty-three years served on death row is not cruel and unusual punishment), ce
 
 rt. denied,
 
 552 U.S. 1197, 128 S.Ct. 1250, 170 L.Ed.2d 89 (2008);
 
 Elledge v. State,
 
 911 So.2d 57, 76 (Fla.2005) (finding no merit in constitutional claim predicated on the cruel and unusual nature of prolonged stay on death row);
 
 Lucas v. State,
 
 841 So.2d 380, 389 (Fla.2003) (concluding that twenty-five years on death row does not constitute cruel and unusual punishment);
 
 Foster v. State,
 
 810 So.2d 910, 916 (Fla.2002) (holding that twenty-three years on death row is not cruel and unusual punishment). Therefore, Johnston’s claim that execution after an inordi
 
 *28
 
 nate length of time on death row is unconstitutional is without merit.
 

 Johnston also cites the “binding norms of international law” as a basis to require that a death row inmate’s sentence be reduced to life, where his stay on death row has become protracted. This claim has also been rejected by the Court. In 2005, we denied relief on this same claim in
 
 Elledge v. State,
 
 stating:
 

 Elledge’s contention that his now thirty-one-year stay on death row violates international law is procedurally barred as it could have [been] but was not raised on direct appeal and is also meritless.
 
 See [Knight v. State,
 
 746 So.2d 423, 437 (1998)] (summarily denying the claim that Florida had forfeited its right to execute Knight under binding norms of international law).
 

 Elledge,
 
 911 So.2d at 77;
 
 see also Booker v. State,
 
 773 So.2d 1079, 1096 (Fla.2000) (rejecting Booker’s claim that the State forfeited its right to execute him under binding norms of international law).
 

 Finally, Governor Martinez signed a death warrant for Johnston in 1988, only four years after his placement on death row. Instead of having the execution take place in 1988, Johnston exercised his rights to numerous postconviction proceedings, which have contributed to the delay of his execution. Therefore, Johnston cannot now contend that his punishment has been illegally prolonged. The delay in carrying out his sentence is largely due to his own actions challenging his conviction and sentence.
 
 See Tompkins v. State,
 
 994 So.2d 1072, 1085 (Fla.2008),
 
 cert. denied,
 
 - U.S. -, 129 S.Ct. 1305, 173 L.Ed.2d 483 (2009). Accordingly, relief is denied on this claim.
 

 Shackling at Trial
 

 In his final claim, Johnston argues that he was denied due process when his legs were shackled at trial, and that the trial court erred in summarily denying his claim. When determining whether an evi-dentiary hearing is required on a successive rule 3.851 motion, “[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief, the motion may be denied without an evidentiary hearing.” Fla. R.Crim. P. 3.851(f)(5)(B). Because a court’s decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review.
 
 See Ventura v. State,
 
 2 So.3d 194, 197 (Fla.2009).
 

 At the outset, we recognize that shackling is “inherently prejudicial.”
 
 Holbrook v. Flynn,
 
 475 U.S. 560, 568-69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). However, we also note that “[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.”
 
 Illinois v. Allen,
 
 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). To that end, shackles may be appropriate to preserve an essential state interest such as courtroom security.
 
 See Estelle v. Williams,
 
 425 U.S. 501, 505, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (“Unlike physical restraints ... compelling an accused to wear jail clothing furthers no essential state policy.”). We conclude that summary denial was appropriate, as this claim lacks merit and is also procedurally barred.
 

 First, this claim is procedurally barred because Johnston raised this same claim on direct appeal. There, we concluded that the claim was without merit and denied relief.
 
 See Johnston,
 
 497 So.2d at 865-66. While Johnston’s issue statement on direct appeal was phrased as a chai-
 
 *29
 
 lenge to the trial court’s refusal to grant a new trial on the grounds of shackling, the substance of Johnston’s argument amounted to a due process claim — Johnston asserted that he was denied a fair trial — the same claim he now makes again. Consequently, we find that this claim is procedurally barred.
 

 Second, the record refutes Johnston’s claim that he is entitled to relief. While the record reflects that pursuant to the court’s order, Johnston’s legs were shackled at trial, the record also reveals that the court made its decision about Johnston’s shackles after a discussion concerning the specific need for the restraints. Before jury selection, when Johnston appeared in court wearing leg and belt shackles, the court inquired about the need for the restraints. The chief bailiff reported that Johnston routinely exhibited belligerent behavior while in jail. He cited numerous incident reports that indicated Johnston fought with other inmates, had previously choked a jail sergeant, and had recently resisted an officer who was trying to transport him back to jail. The court ordered that the shackles remain in place. The information provided to the court, which highlighted Johnston’s resistance to those charged "with his custody and safekeeping, supplied a reasonable basis for the court to restrain Johnston as a security risk. The record also reflects that the table was rearranged so that the shackles would not be seen by the jury. Thus, Johnston was not deprived of due process in this regard. Moreover, we note that the court also instructed that the belt shackles be taken off, but Johnston himself refused to have them removed. Johnston’s claim that he is entitled to relief due to the leg shackles, when he insisted on wearing more noticeable belt restraints, is without merit.
 

 Therefore, in addition to being procedurally barred, the record conclusively demonstrates that the trial court took reasonable steps to ensure that the shackles would not be visible to the jury. The trial court conducted a ease-specific analysis, made its decision based on information regarding Johnston’s behavior, used a reasonable method of restraint under the circumstances, and ensured that the jury would not be able to see the leg shackles that Johnston was required to wear. Thus, Johnston is not entitled to relief on this claim.
 

 CONCLUSION
 

 For the reasons stated above, we affirm the postconviction court’s orders denying Johnston’s fourth and fifth successive motions for postconviction relief. We hereby lift the stay imposed by this Court on May 21, 2009.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . The issues raised in the instant postconviction proceeding were: (1) a motion for DNA testing of items bearing evidence of human blood and for DNA testing of the fingernail clippings taken from the victim; (2) newly discovered evidence consisting of a recent report by the National Academy of Sciences, titled
 
 Strengthening Forensic Science in the United States: A Path Forward,
 
 reveals Johnston’s conviction was based on infirm forensic evidence; (3) a motion for production of latent fingerprints, a pair of his shoes, and plaster casts of shoeprints in evidence at trial, for additional forensic testing; (4) the clemency process is arbitrary and capricious in violation of the constitution; (5) Johnston is exempt from execution because he is severely mentally ill; (6) the death penalty is now unconstitutional and violates binding international law because of the inordinate length of time he has been on death row; and (7) the shackling of Johnston at trial violated the constitution.
 

 [2]
 

 . Rule 3.853 originally contained a deadline for filing motions for postconviction DNA testing of October 1, 2003. That was later extended to October 1, 2005. Prior to expiration of the October 1, 2005, deadline, the Court on September 29, 2005, issued an order amending rule 3.853(d), extending the deadline to July 1, 2006. The Legislature then enacted chapter 2006-292, Laws of Florida (the Act), which amended chapter 925, Florida Statutes. The Act removed the deadline for filing postconviction DNA motions, and the Court responded by adopting the amendment to rule 3.853(d) in
 
 In re Amendments to Fla. Rule of Criminal Procedure 3.853(d),
 
 938 So.2d 977 (Fla.2006). In 2007, rule 3.853 was amended to state that the motion may be filed or considered at any time after the judgment and sentence become final, as the statute provides.
 
 See In re Amendments to Fla. Rules of Criminal Procedure 3.170 & 3.172,
 
 953 So.2d 513 (Fla.2007). However, we urge postconviction counsel to file any viable motion for DNA testing at the earliest opportunity and not wait until the eve of execution to determine that DNA testing is necessary.
 

 [3]
 

 . Items K2 (shorts), K36 (right tennis shoe), K37 (left tennis shoe), K41a (striped sock), K41b (plain white sock), K42a (big sock), and K42b (small sock).
 

 [4]
 

 .
 
 Duckett v. State,
 
 918 So.2d 224, 238-39 (Fla.2005) (holding that where a relinquishment order gave narrow instructions to the circuit court to determine if clothing existed for DNA testing, it was not intended to open the case up to new claims).
 

 [5]
 

 .
 
 See
 
 Nat’l Research Council,
 
 Strengthening Forensic Science in the United States: A Path Forward
 
 (2009),
 
 available at
 
 www.ncjrs.gov/ pdffiles l/nij/grants/228091 .pdf.
 

 [6]
 

 .
 
 See
 
 Science, State, Justice, Commerce, and Related Agencies Appropriations Act, Pub.L. No. 109-108, 119 Stat. 2290 (2005).
 

 [7]
 

 . Johnston has already raised an
 
 Atkins
 
 claim in a prior proceeding. The postconviction court in that case denied the claim after an evidentiary hearing, concluding that Johnston is not mentally retarded. We affirmed in
 
 Johnston v. State,
 
 960 So.2d 757 (Fla.2006).
 

 [8]
 

 . We distinguish the claim Johnston makes here from a claim of insanity as a bar to execution. In order for insanity to bar execution, the defendant must lack the capacity to understand the nature of the death penalty and why it was imposed.
 
 See
 
 § 922.07(3), Fla. Stat. (2009);
 
 Provenzano v. State,
 
 760 So.2d 137, 140 (Fla.2000). Florida Rule of Criminal Procedure 3.811 provides the procedure for asserting that a prisoner is insane, as that term is defined, and provides that the claim may not be made until a death warrant is signed.