PER CURIAM.
David Alan Gore, a prisoner under sentence of death, appeals the summary denial of his successive motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. On February 28, 2012, the Governor signed a death warrant for Gore, with the execution scheduled for April 12, 2012. Gore subsequently sought postconviction *771 relief in the circuit court, presenting five claims. On March 15, 2012, the circuit court entered an order that summarily denied relief on all claims. For the reasons discussed below, we affirm the order of the circuit court. We hold that the recent decision from the United States Supreme Court in Martinez v. Ryan, — U.S. -, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), does not provide Gore with any basis for relief in this Court.
FACTS AND PROCEDURAL HISTORY
On March 15, 1984, a jury found David Alan Gore guilty of the first-degree murder of Lynn Elliott. The facts of the murder were stated in the opinion of this Court affirming the judgment and sentence of death on Gore’s initial direct appeal:
Gore and his cousin picked up fourteen-year-old [R.M.[1]] and seventeen-year-old Lynn Elliott who were hitchhiking to the beach. After the glove compartment in the pickup truck fell open and a gun became visible, Gore took the gun and held it to [R.M.’s] head. He grabbed the two girls’ wrists and held them together. Gore then said that they should take the girls to Gore’s home. He told the girls that if they said or did anything, they would be killed. When they arrived at his home, the girls were handcuffed and taken into a bedroom. The girls then were separated, and Lynn was tied up while [R.M.] was handcuffed. Gore cut [R.M.’s] clothes off of her and sexually assaulted her on three separate occasions. [R.M.] testified that she heard noises in the other room after Gore had left her. She heard Gore tell Lynn to shut up or he would kill her. Gore also told [R.M.] to be quiet or he would slit her throat and that he would do it anyway. Gore then put [R.M.] in the closet, and, after he left, she heard two or three shots. Gore then came back into the room and put [R.M.] in the attic where she stayed until rescued by a police officer.
Michael Rock, a fifteen-year-old boy, testified that on July 26, 1983, while riding his bicycle in the area of Gore’s home, he heard screaming and observed a naked girl running down the driveway being chased by Gore who was also naked. He saw Gore catch up to her, drag her back to a palm tree, and shoot her twice in the head. Rock went home and told his mother, and she called the police. The police arrived and surrounded Gore’s home. Lynn’s body was found in the trunk of the car in the driveway. Her arms and legs had been tightly bound with rope. She had multiple abrasions on her body consistent with falling and being dragged. The gun used to kill her was found in Gore’s home.
Gore was indicted for the first-degree, premeditated murder of Lynn Elliott, for the kidnapping of Lynn Elliott, for the kidnapping of [R.M.], and for three counts of sexual battery of [R.M.]. He was found guilty of all six counts. After a jury recommendation of death, the trial court imposed the death sentence for the first-degree murder of Lynn Elliott and imposed life sentences for the other crimes.
Gore v. State, 475 So.2d 1205, 1206 (Fla. 1985) (Gore I), cert. denied, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986).
*772 On direct appeal, this Court affirmed the convictions and death sentence. See id. The Court subsequently affirmed the denial of- Gore’s initial rule 3.850 motion for postconviction relief and denied his petition for writ of habeas corpus. See Gore v. Dugger, 532 So.2d 1048, 1051 (Fla.1988) (Gore II). However, the United States District Court for the Middle District of Florida granted Gore’s federal petition for writ of habeas corpus and vacated his death sentence becaúse the trial court had precluded Gore from presenting nonstatu-tory mitigating evidence in violation of Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), and Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). See Gore v. Dugger, 763 F.Supp. 1110, 1114, 1116 (M.D.Fla.1989) (Gore III), aff'd, 933 F.2d 904, 905 (11th Cir.1991) (Gore IV), cert. denied, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992). After a resentencing proceeding, a jury unanimously recommended death, and the trial court followed that recommendation. . On appeal, this Court affirmed the sentence. See Gore v. State, 706 So.2d 1328, 1336 (Fla.1997) (Gore V), cert. denied, 525 U.S. 892, 119 S.Ct. 212, 142 L.Ed.2d 174 (1998). This Court subsequently affirmed a postconvietion court order that denied Gore relief under Florida Rule of Criminal Procedure 3.850 and also denied a petition for writ of habeas corpus filed by Gore. See Gore v. State, 964 So.2d 1257, 1277-78 (Fla.2007) (Gore VI), cert. denied, 552 U.S. 1197, 128 S.Ct. 1250, 170 L.Ed.2d 89 (2008). On April 11, 2008, the United States District Court for the Southern District of Florida denied a second federal habeas petition filed by Gore. See Gore v. McDonough, No. 07-22637-CIV-LENARD/TORRES (S.D. Fla. order filed Apr. 11, 2008). The United States Court of Appeals for the Eleventh Judicial Circuit subsequently denied Gore a “certificate of appealability,” see Gore v. Secretary, Department of Corrections, No. 08-14060-P (11th Cir. order filed Sept. 9, 2008), and the United States Supreme Court denied certiorari review, see Gore v. McNeil, — U.S. -, 129 S.Ct. 2382, 173 L.Ed.2d 1300 (2009).
Gore raised the following claims in his successive postconviction motion filed after issuance' of the warrant:
1. The clemency “update” process in this case was applied in an arbitrary and capricious manner in violation of the Eighth and Fourteenth Amendments and corresponding provisions of the Florida Constitution.
2. Florida’s capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because of the arbitrary and standard-less power given to the Governor to sign death warrants.
3. Newly discovered evidence establishes that Gore was denied the effective assistance of counsel during his resentencing proceedings.
4. Gore was denied the effective assistance of counsel during his postcon-viction proceedings.
5. Given the inordinate length of time that Gore has spent on death row, adding his execution to that punishment would constitute cruel and unusual punishment.
With regard to the first claim, Gore stated that his clemency “update” process was applied in an arbitrary and capricious manner in violation of the United States and Florida Constitutions. Although Gore first received a clemency proceeding in 1987, the clemency proceeding to which Gore’s claim is directed occurred in 2012. Subsequent to the 1987 proceeding, Gore’s death sentence was overturned due to the refusal of the trial court to allow the presentation of mitigation evidence. Gore con *773 tends that the clemency board’s 1987 investigation was “hardly accurate” because it was devoid of mitigating evidence presented during his 1992 resentencing proceeding. Gore stated that he learned of the 2012 clemency proceedings only after his death warrant was signed and, therefore, was unable to present information on his own behalf. Gore contends that the clemency process was one-sided because it included input from only the State, the victims, and the media, and therein denied his right to due process.
In his second claim, Gore alleged that the Governor of Florida wields an arbitrary and standardless power to sign death warrants, thereby rendering the Florida capital sentencing scheme unconstitutional. Gore notes that there are at least forty-two other death row inmates who are currently eligible for a death warrant, and the only reason he was selected was because a newspaper editorial board expressed an interest in the execution of Gore.
In his third claim, Gore alleges that newly discovered evidence establishes that he was denied the effective assistance of counsel during his resentencing. Following the Eleventh Circuit Court of Appeals’ affirmance in May 1991 of the federal district court order granting Gore relief from his death sentence, Robert Udell was appointed to represent Gore during his re-sentencing proceedings, which ultimately resulted in a unanimous jury recommendation of death. During subsequent postcon-viction proceedings, Gore alleged that his resentencing counsel were ineffective. During the 2003 evidentiary hearing, Udell testified with regard to his representation of Gore, which included a discussion of why certain decisions were made. Thereafter, this Court affirmed the denial of postconviction relief and concluded that penalty phase counsel were not deficient.
Gore asserted that, unknown to postcon-viction counsel, the postconviction court, and this Court, Udell was not a credible witness. In October 2009, Udell was disbarred from the practice of law by this Court. Among other admissions, Udell admitted to submitting several affidavits and filing several motions for fees that contained false information about services performed for clients between 2005 and 2008. According to Gore, Udell’s disbarment and his failure to be truthful indicate he is unable to be honest, even under oath. Resentencing co-counsel Jerome “Jay” Nickerson, who did not testify during the postconviction proceedings, informed current defense counsel that during the resen-tencing, Udell was responsible for preparing all mitigation other than mental health mitigation and rebuttal to the evidence in aggravation presented by the State. However, when Nickerson arrived just before the penalty phase, he discovered that Udell had done nothing to prepare for the resentencing. Udell had not spoken to, or met with, the mitigation witnesses, and he had not prepared for any of the evidence that the State intended to present. Gore contended that because this Court relied so heavily on testimony from Udell during the postconviction evidentiary hearing, the prejudice analysis that this Court conducted with regard to Gore’s ineffectiveness claims was flawed. Gore requested an evidentiary hearing so he could establish that Udell’s penalty phase representation was deficient.
Fourth, Gore alleged that he was denied the effective assistance of counsel during his postconviction proceedings. Resentencing co-counsel Nickerson did not testify during the evidentiary hearing because collateral counsel claimed that he was unable to locate Nickerson. This Court stated that Gore’s failure to produce Nickerson at the hearing contributed to the failure of Gore to satisfy the legal *774 burden of an ineffective assistance of counsel claim. In his successive motion, Gore contended that the failure of post-conviction counsel to produce Nickerson during the collateral proceedings constituted deficient performance that prejudiced Gore. Because Gore’s first opportunity to obtain review of resentencing counsel’s effectiveness was during his postconviction proceeding, Gore asserted that collateral counsel owed him the duty of effective representation.
In his final claim, Gore contended that, given the length of time he has already spent on death row, adding execution to that punishment would constitute cruel and unusual punishment in violation of the United States Constitution and binding norms of international law.
The circuit court held a hearing on the successive motion on March 13, 2012. After hearing legal arguments, and considering the motion and the State’s response, the circuit court entered an order on March 15, 2012, summarily denying the successive motion. On March 26, 2012, Gore filed his initial brief with this Court raising the same issues that were raised in his successive motion.
ANALYSIS

Standard of Review

In Walton v. State, 3 So.3d 1000 (Fla.2009), this Court articulated the standard of review of a summarily denied post-conviction claim:
A successive rule 3.851 motion may be denied without an evidentiary hearing if the records of the case conclusively show that the movant is entitled to no relief. See Fla. R.Crim. P. 3.851(f)(5)(B). This Court reviews the circuit court’s decision to summarily deny a successive rule 3.851 motion de novo, accepting the movant’s factual allegations as true to the extent they are not refuted by the record, and affirming the ruling if the record conclusively shows that the mov-ant is entitled to no relief.
Id. at 1005. Because the circuit court summarily denied each of Gore’s claims, the parameters articulated in Walton are applicable to each issue presented by Gore.

Newly Discovered Evidence

Gore contends that the 2009 disbarment of his penalty phase counsel, Robert Udell, constitutes newly discovered evidence, and that the circuit court erred when it denied this claim without an evidentiary hearing. We disagree.
To obtain relief on the basis of newly discovered evidence, a defendant must satisfy a two-prong test:
First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, “the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.” [Jones v. State, 709 So.2d 512, 521 (Fla.1998) (Jones II) ]. Newly discovered evidence satisfies the second prong of the Jones II test if it “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.” Jones II, 709 So.2d at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)). “If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence.” Marek v. State, 14 So.3d 985, 990 (Fla. 2009) (citing Jones v. State, 591 So.2d 911, 915 (Fla.1991) (Jones I)).
Johnston v. State, 27 So.3d 11, 18-19 (Fla. 2010). We conclude that regardless of whether Gore can establish due diligence *775 in discovering the disbarment of Udell, he cannot establish that the disbarment “would probably yield a less severe sentence.” Id.
As a preliminary matter, Gore fails to demonstrate how the disbarment of Udell in 2009 for conduct that occurred from 2005 through 2008 establishes that he was ineffective during the resentencing trial in 1992. The asserted attorney misconduct that occurred more than a decade after a resentencing proceeding, and had no relation whatsoever to a particular defendant, is not relevant to the representation of this defendant more than a decade before. Therefore, we conclude that Udell’s 2009 disbarment, which occurred seventeen years after the resentencing proceeding, is not the type of evidence that, if considered by a jury on retrial, would probably “yield a less severe sentence.” Id.; see also Wyatt v. State, 71 So.3d 86, 100 n. 14 (Fla.2011) (noting that not all new evidence “is the equivalent of newly discovered evidence for the purposes of establishing a postconviction claim”).
Furthermore, this Court has previously rejected a claim that Udell’s disbarment constitutes newly discovered evidence for purposes of impeaching his postconviction evidentiary hearing testimony. In Kearse v. State, No. SC11-244 (Fla. Oct. 21, 2011) (75 So.3d 1244) (table report), a capital defendant Sled a successive rule 3.851 motion. Kearse argued that his initial postconviction motion alleging ineffective assistance of penalty phase counsel should be reexamined in light of newly discovered evidence that his trial counsel, Robert Udell, submitted false fee affidavits during the period of 2005 through 2008 and was disbarred for this conduct in October 2009. The circuit court summarily denied Kearse’s successive motion.[2]
On appeal, this Court unanimously affirmed the trial court’s denial in a brief order that provided:
Billy Leon Kearse filed a second successive postconviction motion in which he asserted that his prior claim of ineffective assistance of counsel should be reexamined in light of newly discovered evidence about his trial counsel. The postconviction court summarily denied the motion. We hereby affirm the post-conviction court’s summary denial. Because Kearse did not present any evidence that would probably result in a finding that trial counsel was ineffective, the postconviction court properly denied his newly discovered evidence claim as legally insufficient.
Kearse v. State, No. SC11-244, order at 1. We similarly conclude that the use of Udell’s disbarment to impeach his credibility during Gore’s initial postconviction proceeding after resentencing would not produce a different result with regard to the claim that penalty phase counsel were ineffective. This Court, in affirming the denial of the rule 3.850 motion in Gore VI, held that the prejudice prong of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), had not been satisfied.
In his appeal from the circuit court’s denial of his initial motion for postconviction relief after resentencing, Gore asserted that his penalty phase counsel were ineffective for: (1) calling witness Robert Stone, who testified with regard to parole possibilities; (2) failing to provide an expanded instruction on the cold, calculated, and premeditated aggravating factor (CCP); (3) failing to discover and expose to the jury on cross-examination that the *776 State’s mental health expert charged more than $27,000 for his testimony; and (4) failing to discover and present witnesses who could testify to the mitigating circumstance that Gore suffered from neurologic disorders due to exposure to toxic chemicals used in citrus agriculture.[3] In our decision affirming the denial of relief, this Court found that co-counsel Nickerson— not Udell — served as lead counsel during the resentencing and made the majority of strategic decisions.[4] Most of the conclusions reached by this Coui't addressed conduct by Nickerson, and Udell’s testimony during the evidentiary hearing with regard to the decisions of Nickerson was tangential at best.
For example, with regard to the calling of witness Stone, we noted in Gore VI that the decision to do so was “made solely by Nickerson,” and this Court held that Nick-erson had a strategic reason for his actions, despite Udell’s testimony to the contrary that “we all kn[e]w that Mr. Stone was not going to be friendly to David Alan Gore in his testimony.” 964 So.2d at 1269. Further, we concluded that even if Nicker-son was deficient, “there was no prejudice.” Id. at 1270. The testimony of Udell played little to no role in our determination of this issue. With regard to this claim, we stated “it appears that Gore’s counsel should have located and presented evidence from Nickerson, as his testimony would have directly revealed his strategies in calling Stone.” Id. (emphasis supplied).
With regard to the failure to propose an expanded CCP instruction, we concluded that penalty phase counsel were not deficient because “Gore’s counsel was not even required to initially object to this standard CCP instruction as this jury instruction was considered proper [at the time of Gore’s resentencing proceedings].” Id. at 1275. We then held that Gore had failed to establish prejudice, concluding that “the jury would have returned a finding of CCP due to the overwhelming evidence of this aggravator.” Id. at 1276.
With regard to the failure to expose the State mental health expert’s fee on cross-examination, we concluded that Gore had not met his burden of establishing ineffectiveness because “Udell cannot provide evidence about what Nickerson may have been thinking in his decisions, and Nicker-son was not produced as a postconviction witness.” Id. at 1271. We then concluded that “Nickerson’s decision to not impeach through questions targeted at financial bias can certainly be viewed as ‘sound trial strategy.’ ” Id. We also held that even if deficiency was established, Gore failed to demonstrate prejudice because the expert’s “testimony was not essential to the trial court finding the existence of no statutory mitigators on resentencing.” Id. at 1272. The opinion provided:
For example, Gore’s argument that he was intoxicated by alcohol at the time of the incident was refuted by numerous other individuals, rather than just [the State expert]. At the resentencing, [R.M.] testified that Gore did not smell of alcohol, did not slur his words, did not have bloodshot eyes, and was in complete control. Eyewitness Michael Rock testified that Gore did not stagger in the *777 driveway when he ran after Elliott. Detective Redstone, Captain Dubois, and Officer Raymond all testified that Gore had no signs of alcohol impairment at the time of arrest.
Id. Moreover, we concluded that even if the State expert had been impeached with financial bias, “a death sentence would have likely still resulted due to the strength of the six aggravators that were independently found.” Id.
Finally, with regard to the failure to present evidence of exposure to toxic chemicals, we held that the failure of penalty phase counsel to pursue this theory was not deficient:
At the evidentiary hearing, Udell stated that it is dangerous to make tenuous arguments that sound only like “lawyer talk,” because the jury might punish that party for making a seemingly senseless argument. Nickerson could have engaged in that thought process when he determined that he would not pursue this argument, but again, this was not confirmed because Nickerson did not testify at the evidentiary hearing.
Id. at 1274 (emphasis supplied). We also concluded that Gore had not shown prejudice because
extensive mitigation was already presented at the resentencing. Even if the trial court at resentencing had found this one additional mitigating factor involving neurological disorders from citrus grove pesticide exposure, which is a tenuous theory at best, this would not have overcome the trial court’s finding of six aggravating factors which, as previously described, are supported by strong evidence.
Id. at 1275.
Thus, our 2007 decision in Gore VI demonstrates that, as in Kearse, even if evidence of Udell’s disbarment was introduced to impeach his testimony during the evidentiary hearing, this evidence is not of such a nature that it would probably produce a less severe sentence, or even a conclusion that penalty phase counsel were ineffective. Such a conclusion is even stronger than it was in Kearse. Here, this Court evaluated the ineffective assistance claims based upon attorney Nickerson’s performance. Accordingly, to the extent that Udell did testify, it contributed little to our ultimate determination as to Nicker-son’s actions during Gore’s resentencing proceedings. This is in contrast to Kearse, where Udell was the only attorney who represented Kearse and, therefore, testified during the evidentiary hearing to his own strategic decisions during Kearse’s trial.[5]
The record conclusively demonstrates that Gore is not entitled to relief based upon a claim of newly discovered evidence, and we affirm the summary denial of this claim by the circuit court.

Ineffective Assistance of Postconviction Counsel

Gore next contends that during the initial collateral review proceedings, his post-conviction counsel was ineffective for failure to locate penalty phase co-counsel Nickerson and present his testimony. Gore asserts that the recent decision of the *778 United States Supreme Court in Martinez, 132 S.Ct. 1309, creates a new and independent cause of action for ineffective assistance of collateral counsel in our state courts system. While the decision in Martinez does contain expansive language, a proper analysis reveals that the Supreme Court specifically declined to address the issue of whether a constitutional right to effective assistance of collateral counsel exists:
While petitioner frames the question in this case as a constitutional one, a more narrow, but still dispositive, formulation is whether a federal habeas court may excuse a procedural default of an ineffective-assistance claim when the claim was not properly presented in state court due to an attorney’s errors in an initial-review collateral proceeding.
Id. at 1313. Even Justice Scalia in his dissent acknowledged that the majority chose to evade this issue. See id. at 1326 (Scalia, J., dissenting) (noting that the re-framing of the issue “avoid[ed] the Court’s need to confront the established rule that there is no right to counsel in collateral proceedings”). It appears that Martinez is directed toward federal habeas proceedings and is designed and intended to address issues that arise in that context.
Here, Gore previously received full consideration of his ineffective assistance of penalty phase counsel claims in the post-conviction court and a comprehensive review of those claims during his appeal before this Court. Gore has received a full collateral review to which he is entitled in the Florida state courts system. We hold that under the facts and circumstances of this case, Martinez provides Gore with no basis for relief in this Court.
Even if the United States Supreme Court in Martinez had chosen to alter decades of precedent and hold that a claim of ineffective assistance of collateral counsel is now an independent, cognizable claim — which we conclude that it did not— Gore still could not establish that he is entitled to relief under Strickland due to the failure of collateral counsel to locate Nickerson. As previously discussed, this Court and the trial court found that Gore failed to establish prejudice on his claims of ineffective assistance of penalty phase counsel. Thus, even if collateral counsel had been deficient for a failure to locate and present Nickerson as a witness during the evidentiary hearing, Gore cannot demonstrate that confidence in the outcome of the postconvietion proceedings would have been undermined if Nickerson had testified. Therefore, his claim of ineffective assistance of collateral counsel would not succeed.
Gore’s challenges to the effectiveness of his collateral counsel fail. We affirm the summary denial of this claim.

Clemency Process

In his third challenge, Gore contends that the 2012 clemency proceeding that occurred in this case was applied in an arbitrary and capricious manner in violation of United States and Florida Constitutions. Gore asserts that although numerous individuals were informed of their right to participate in this crucial stage of the criminal proceedings, he was not. Gore also contends that although the Governor may have considered the 2012 proceedings at issue to be an “update” to the prior clemency proceeding in 1987, that characterization ignores that Gore’s 1984 death sentence was overturned subsequent to the 1987 proceedings. According to Gore, the only arguably constitutionally valid penalty phase proceeding in this case occurred in 1992, but a full clemency proceeding did not follow this phase. Gore contends that without notice, an opportunity to be heard, or presence of counsel, the *779 2012 clemency “update” did not comport with due process.
We disagree. The Florida Rules of Executive Clemency expressly provide that “[t]he Governor has the unfettered discretion to deny clemency at any time, for any reason.” Fla. R. Exec. Clem. 4 (emphasis supplied). Further, this Court has repeatedly declined to interject itself into what is, under the Florida Constitution, an executive function. For example, in Bundy v. State, 497 So.2d 1209, 1211 (Fla.1986), a defendant under an active death warrant contended that he must be allowed time to prepare and present a second petition for clemency, even though he had already received an earlier clemency proceeding. In denying relief, the Court noted the separation of powers issue that such a claim presented:
In the death warrant authorizing appellant’s execution, the governor attests to the fact that “it has been determined that Executive Clemency, as authorized by Article IV, Section 8(a), Florida Constitution, is not appropriate.” It is not our prerogative to second-guess the application of this exclusive executive function. First, the principle of separation of powers requires the judiciary to adopt an extremely cautious approach in analyzing questions involving this admitted matter of executive grace. Sullivan v. Askew, 348 So.2d 812 (Fla.), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159 (1977). As noted in In re Advisory Opinion of the Governor, 334 So.2d 561, 562-63 (Fla.1976), “[t]his Court has always viewed the pardon powers expressed in the Constitution as being peculiarly within the domain of the executive branch of government.” See also Ex Parte White, 131 Fla. 83, 178 So. 876 (1938).
Second, the governor and cabinet held an earlier clemency hearing in relationship to appellant’s conviction for the Tallahassee murders and found no basis on which to grant him relief. We cannot say that the executive branch was required to go through the motions of holding a second proceeding when it could well have properly determined in the first that appellant was not and never would be a likely candidate for executive clemency.
Id. (emphasis supplied); see also Glock v. Moore, 776 So.2d 243, 252-53 (Fla.2001) (relying on Bundy to reject capital defendant’s claim that he was denied access to a second clemency process because he was not represented by counsel and he did not have an opportunity to present mitigating evidence).
Here, Gore received a clemency proceeding in 1987. He does not allege that this earlier proceeding was deficient. Instead, he alleges that he is entitled to a full updated clemency proceeding because additional mitigation was revealed during his 1992 resentencing proceeding. However, the Court has also rejected clemency challenges on this basis.
In Johnston v. State, 27 So.3d 11, 24 (Fla.2010), the defendant contended that “the clemency proceeding he was provided in 1987 was inadequate because it was held before the postconvietion proceedings were concluded and before his mental health issues and life history were fully developed for consideration in the clemency process.” In rejecting this claim, the Court noted that “no specific procedures are mandated in the clemency process and that Johnston [was] provided with the clemency proceedings to which he is entitled.” Id. at 25-26. We also declined to depart from our prior precedent in which we refused to second-guess the executive branch on matters of clemency. See id. at 26. This Court subsequently relied on Johnston when it rejected a capital defendant’s claim that the *780 death penalty in Florida is arbitrary and capricious because although the defendant received a prior clemency proceeding, he did not have the opportunity to present additional information about his life in a more recent clemency proceeding. See Grossman v. State, 29 So.Bd 1034, 1044 (Fla.2010) (“Grossman has not provided any reason why this Court should depart from its well-established precedent on this issue, and we thus deny relief on this claim.”).
In light of the foregoing, we conclude that the circuit court properly denied this claim without an evidentiary hearing.

Authority of the Governor to Sign Death Warrants

Gore next contends that the allegedly arbitrary power of the Governor to sign death warrants renders the Florida capital sentencing scheme unconstitutional. Our analysis in the previous section applies equally to this claim. The same principles — the Governor’s unfettered discretion under the Florida Rules of Executive Clemency, see Fla. R. Exec. Clem. 4, and separation of powers concerns — arise again in the context of a claim that the Governor’s decision to sign Gore’s warrant was arbitrary and standardless. As recently as last year, we rejected claims that because of the Governor’s absolute discretion to sign death warrants, thereby deciding who lives and who dies, the death penalty structure of Florida violates the United States Constitution. See Valle v. State, 70 So.3d 530, 551-52 (Fla.2011) (quoting Marek v. State, 14 So.3d 985, 998 (Fla.2009)), cert. denied, — U.S. -, 132 S.Ct. 1, 180 L.Ed.2d 940 (2011); see also Johnston, 27 So.3d at 24 (rejecting a claim that Florida’s clemency process is “arbitrary, lacks standards, [and] is one-sided”).
Gore does not dispute that he is eligible for a death warrant, and the signed warrant expressly states that the Governor considered clemency and determined that it was not appropriate. In light of the foregoing, and for the same reasons discussed in the prior issue, this claim also fails.

Length of Time on Death Row

Finally, Gore contends that because of the time that he has already spent on death row, adding execution to that punishment would violate the Eighth Amendment and its ban on cruel and unusual punishment, as well as the Fourteenth Amendment and “binding norms of international law.” We reject this claim as both successive and without merit.
Gore previously presented an unsuccessful challenge that extensive time spent on death row constitutes cruel and unusual punishment:
Gore argues that his twenty-three years served on death row is cruel and unusual punishment, and violates both the Eighth and Fourteenth Amendments of the United States Constitution. This Coui't has consistently rejected the argument that serving time on death row is cruel and unusual punishment, regardless of the time served. See Lucas v. State, 841 So.2d 380, 389 (Fla. 2003) (holding that over twenty-five years on death row is not cruel and unusual punishment); Foster v. State, 810 So.2d 910, 916 (Fla.2002) (holding that twenty-three years on death row is not cruel and unusual punishment). Gore’s exercise of his constitutional rights through the appeal and postcon-viction process has prevented his death sentence from being executed, so he may not claim a constitutional violation due to his length of time on death row. See Knight v. State, 746 So.2d 423, 437 (Fla.1998) (“[N]o federal or state courts have accepted [the] argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially *781 where both parties bear responsibility for the long delay.”). Therefore, Gore’s claim is without merit.
Gore VI, 964 So.2d at 1276. Since this Court’s 2007 decision, we have repeatedly rejected similar challenges. See, e.g., Johnston, 27 So.3d at 27 (rejecting a claim that almost twenty-five years on death row constitutes cruel and unusual punishment); Marek v. State, 8 So.3d 1123, 1130-31 (Fla. 2009) (same for twenty-five years on death row); Tompkins v. State, 994 So.2d 1072, 1085 (Fla.2008) (same for twenty-three years on death row). Moreover, on February 15, 2012, Robert Brian Waterhouse— an inmate who had been on death row for over thirty years — was executed. Thus, relief is not warranted on this claim.
CONCLUSION
In accordance with our analysis above, we affirm the summary denial of relief by the circuit court. We further hold that Gore is not entitled to relief from this Court under the recent decision of the United States Supreme Court in Martinez v. Ryan. No motion for rehearing will be entertained by this Court. The mandate shall issue immediately.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. Due to the fourteen-year-old’s status as a surviving victim of sexual assault, we refer to her as R.M.

. The circuit court judge who presided over Kearse’s successive postconviction proceeding also presided over Gore’s current successive proceeding.

. In his postconviction motion, Gore also claimed that his trial counsel were ineffective for failing to discover and present evidence that Gore was abused by his mother. However, Gore subsequently withdrew this claim.

. Consistent with this determination, on appeal Gore also contended that Udell was ineffective because he totally deferred to Nicker-son during the resentencing proceedings. See Gore VI, 964 So.2d at 1273. This Court held that the strategic decision of Udell "to defer on a limited basis to the apparent abilities of Nickerson" did not constitute deficient performance. Id.

. Further, the evidentiary hearing on Kearse’s postconviction motion, during which Udell testified, occurred in 2005 — the same year that Udell engaged in misconduct by submitting false fee affidavits. This is in stark contrast to the instant case where Udell testified years before engaging in the conduct that led to his disbarment. Thus, the argument that Udell’s disbarment, or the dishonest conduct that led to his disbarment, is relevant to the testimony offered by Udell during the 2003 evidentiary hearing is even more tenuous here than it was in Kearse.